CHANDLER, U. S. DISTRICT JUDGE *v.* JUDICIAL
COUNCIL OF THE TENTH CIRCUIT

No. 2, Misc. Argued December 10, 1969—Decided June 1, 1970

*Thomas J. Kenan* argued the cause and filed a brief for petitioner.

*Charles Alan Wright* argued the cause and filed a brief for respondent.

*Carl L. Shipley* argued the cause and filed briefs as *amicus curiae* in support of petitioner.

*Solicitor General Griswold* argued the cause and filed a brief for the United States as *amicus curiae* in support of respondent.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

Petitioner, a United States District Judge, filed a motion for leave to file a petition for a writ of mandamus or alternatively a writ of prohibition addressed to the Judicial Council of the Tenth Circuit. His petition seeks resolution of questions of first impression concerning, *inter*

*alia,* the scope and constitutionality of the powers of the Judicial Councils under 28 U. S. C. §§ 137 and 332.[1] The Judicial Council of each federal circuit is, under the present statute, composed of the active circuit judges of the circuit. Petitioner has asked this Court to issue an order under the All Writs Act [2] telling the Council to "cease acting [in] violation of its powers and in violation of Judge Chandler's rights as a federal judge and an Amer-

---

[1] 28 U. S. C. § 137. "Division of business among district judges.

"The business of a court having more than one judge shall be divided among the judges as provided by the rules and orders of the court.

"The chief judge of the district court shall be responsible for the observance of such rules and orders, and shall divide the business and assign the cases so far as such rules and orders do not otherwise prescribe.

"If the district judges in any district are unable to agree upon the adoption of rules or orders for that purpose the judicial council of the circuit shall make the necessary orders."

28 U. S. C. § 332. "Judicial Councils.

"The chief judge of each circuit shall call, at least twice in each year and at such places as he may designate, a council of the circuit judges for the circuit, in regular active service, at which he shall preside. Each circuit judge, unless excused by the chief judge, shall attend all sessions of the council.

"The council shall be known as the Judicial Council of the circuit.

"The chief judge shall submit to the council the quarterly reports of the Director of the Administrative Office of the United States Courts. The council shall take such action thereon as may be necessary.

"Each judicial council shall make all necessary orders for the effective and expeditious administration of the business of the courts within its circuit. The district judges shall promptly carry into effect all orders of the judicial council."

[2] 28 U. S. C. § 1651. "(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

ican citizen." The background facts are of some importance.

1

On December 13, 1965, the Judicial Council of the Tenth Circuit convened in special session [3] and adopted an order which reflected a long history of controversy between petitioner and the Council concerning the conduct of the work of the District Court assigned to petitioner. The Order of December 13 purported to issue under the authority of 28 U. S. C. § 332, *supra,* n. 1, and recited that during

> "the past four years the Judicial Council at many meetings has discussed and considered the business of the United States District Court for the Western District of Oklahoma and has done so with particular regard to the effect thereon of the attitude and conduct of Judge Chandler who, as the Chief Judge of that District, is primarily responsible for the administration of such business. . . ."

The Order noted that during that period petitioner had been a party defendant in both civil and criminal litigation, as well as the subject of two applications to disqualify him in litigation in which on challenge petitioner had refused to disqualify himself.[4] The Order continued with a finding that

> "Judge Chandler is presently unable, or unwilling, to discharge efficiently the duties of his office; that

---

[3] Chief Judge Alfred P. Murrah took no part in the proceedings.

[4] The civil suit was an action brought by one O'Bryan charging petitioner with malicious prosecution; the complaint was dismissed by the District Court, aff'd *en banc,* 352 F. 2d 987 (C. A. 10th Cir. 1965), cert. denied, 384 U. S. 926 (1966). The criminal indictment charging conspiracy to cheat and defraud the State of Oklahoma was quashed.

In both cases seeking disqualification of petitioner, including one decided after the signing of the Order here challenged, writs of

a change must be made in the division of business
and the assignment of cases in the Western District
of Oklahoma; and that the effective and expeditious
administration of the business of the United States
District Court for the Western District of Oklahoma
requires the orders herein made."

Expressly invoking the powers of the Judicial Council
under 28 U. S. C. § 332, *supra,* n. 1, the Order directed
that

"until the further order of the Judicial Council,
the Honorable Stephen S. Chandler shall take no
action whatsoever in any case or proceeding now
or hereafter pending in the United States District
Court for the Western District of Oklahoma; that
all cases and proceedings now assigned to or pending
before him shall be reassigned to and among the
other judges of said court; and that until the further
order of the Judicial Council no cases or proceedings
filed or instituted in the United States District Court
for the Western District of Oklahoma shall be as-
signed to him for any action whatsoever.

"It is further ORDERED that in the event the
active judges of the United States District Court for
the Western District of Oklahoma, including Judge
Chandler, cannot agree among themselves upon the
division of business and assignment of cases made
necessary by this order, the Judicial Council, upon
such disagreement being brought to its attention,
will act under 28 U. S. C. § 137 and make such divi-
sion and assignment as it deems proper."

mandamus issued against petitioner. See *Occidental Petroleum
Corp.* v. *Chandler,* 303 F. 2d 55 (C. A. 10th Cir. 1962) (*en banc*),
cert. denied, 372 U. S. 915 (1963); and *Texaco, Inc.* v. *Chandler,*
354 F. 2d 655 (C. A. 10th Cir. 1965) (*en banc*), cert. denied, 383
U. S. 936 (1966).

Copies of the above Order were filed in the Court of
Appeals for the Tenth Circuit and in the United States
District Court for the Western District of Oklahoma on
December 27 and 28, respectively. Another copy was
served on Judge Chandler by a U. S. Marshal.

On January 6, 1966, as previously noted, Judge
Chandler filed with this Court his motion for leave to
file a petition for a writ of prohibition and/or mandamus
directed to the Judicial Council. He also sought a stay
of its Order. The Solicitor General, appearing on behalf
of the Judicial Council, asked this Court to deny the stay
application on the Council's representation that the
Order of December 13 was only temporary pending
prompt further inquiry into Judge Chandler's admin-
istration of the business of his court. The stay was
denied on January 21, 1966, on the ground that the
Order was "entirely interlocutory in character pending
prompt further proceedings . . . and that at such pro-
ceedings Judge Chandler will be permitted to appear
before the Council, with counsel . . . ." 382 U. S. 1003.

On January 24, 1966, Judge Chandler addressed a
letter to his fellow district judges indicating that he ob-
jected to the removal and reassignment of cases previ-
ously assigned and pending before him on December 28,
1965, but that he was *not* in disagreement with them as
to the assignment of all new cases to judges other than
himself. Judge Chandler asserted continuing judicial au-
thority, however, over the cases pending before him as of
December 28. The following day the judges of the
Western District of Oklahoma advised the Judicial Coun-
cil that all judges of that District had agreed on the
division of new business filed in that court, but that
they could not agree on the assignment to other judges
of cases then pending before Judge Chandler.

On January 27, 1966, the Judicial Council again con-
vened in special session and ordered a hearing on Feb-

ruary 10, 1966, in Oklahoma City at which Judge Chandler was invited to appear, with counsel if he desired. However, by February 4, when the Council met again, it had been advised that no judge of the Western District, including Judge Chandler, desired to be heard pursuant to the order for hearing. Accordingly, no hearing took place.

At this same meeting on February 4, 1966, the Council concluded that there was a disagreement among the District Judges of the Western District as to the division of business; it reached this conclusion on the basis of the disagreement between Judge Chandler and the other District Judges as to the reassignment of cases previously assigned to Judge Chandler as of December 28, 1965. The Council accordingly, acting under 28 U. S. C. §§ 137 and 332, entered an order authorizing Judge Chandler to continue to sit on cases filed and assigned to him prior to December 28, 1965; the Order assigned to the other judges of the Western District cases filed after that date. This Order of February 4 recited further that

"4. The division of business and assignment of cases made herein may be amended or modified by written order signed by all active judges of the Western District of Oklahoma, provided that nothing contained herein shall be construed as preventing Judge Chandler from surrendering any pending cases for re-assignment to another active judge or to prevent transfer between judges to whom new business is assigned pursuant to this order.

"5. This order supersedes the orders of the Council entered on December 13, 1965, and on January 27, 1966, entitled 'In the Matter of the Honorable Stephen S. Chandler, United States District Judge for the Western District of Oklahoma' and shall remain in effect until the further order of the Council."

On February 9, 1966, the Solicitor General filed a memorandum on behalf of the Council suggesting that in light of the above developments, namely the confirmation of Judge Chandler's authority to dispose of the case load then before him and the assignment of new business in accordance with an order previously agreed to by Judge Chandler, the case had become moot since there was nothing more to argue about. To this memorandum Judge Chandler filed a reply on February 25, 1966, contesting the suggestion that he had acquiesced in the Council's actions. Judge Chandler argued that his acquiescence in the division of new business settled upon by his fellow district judges was given deliberately for reasons of "strategy" in order to prevent any possibility that the Council could find that "the district judges . . . are unable to agree upon the adoption of rules or orders" for the distribution of business and assignment of cases under 28 U. S. C. § 137.

A supplemental memorandum filed by the Solicitor General on behalf of the Council expressed the latter's position that Judge Chandler should dispose of his pending docket of pre-December 28, 1965, cases before seeking assignment of new cases. In view of Judge Chandler's expressed disagreement with the February 4 Order the Solicitor General withdrew the suggestion of mootness. Later in March 1966 Judge Chandler submitted a reply to that supplemental memorandum asserting that the Council was continuing to act beyond its authority by purporting to require that he certify to it his subsequent willingness and ability to undertake new business. He contended that the supplemental memorandum setting forth the condition that he must apply for assignment was in effect a new order fixing still another condition on the exercise of his judicial office.

On July 12, 1967, the Judicial Council convened and, in light of a report from the District Judges of the

Western District showing that Judge Chandler had only 12 cases then pending, concluded that a modification of the Order of February 4, 1966, might be in order. The Council transmitted a copy of the minutes of the meeting to the District Judges and asked them to consider anew and agree upon a division of business within the Western District. On August 28, 1967, Judge Chandler wrote his district judge colleagues claiming that the Council's action of July 12 was but another "illegal effort" to create a situation in which the Council could assert its powers under 28 U. S. C. § 137 to assign and apportion cases.

On September 1, 1967, the Western District Judges, including Judge Chandler, advised the Judicial Council that "the current order for the division of business in this district *is agreeable* under the circumstances." (Emphasis added.) When the Council convened two weeks later, it noted the letter expressing agreement and concluded that there need be no new order in the case; accordingly the Order of February 4 was left in effect. All of these developments were reported to the Clerk of this Court and are part of the record.

## 2

In essence petitioner challenges all orders of the Judicial Council relating to assignment of cases in the Western District of Oklahoma as fixing conditions on the exercise of his constitutional powers as a judge. Specifically, petitioner urges that the Council has usurped the impeachment power, committed by the Constitution to the Congress exclusively. While conceding that the statute here invoked confers some powers on the Judicial Council, petitioner contends that the legitimate administrative purposes to which it may be turned do not include stripping a judge of his judicial functions as he claims was done here.

The Judicial Council contends that petitioner seeks to invoke the original jurisdiction of this Court in a case to which such jurisdiction does not extend. The Council argues that the purely administrative action taken in this case has never been reviewed by any court and cannot now be reviewed in an original proceeding under the guise of a claim under the All Writs Act.

The Judicial Council also contends that the Order of December 13, 1965, has been altogether superseded by the Order of February 4, 1966. The latter, in accordance with petitioner's desire, gave back those cases that had been temporarily withdrawn from Judge Chandler. It also continued in force the assignment and division of judicial business agreed upon by the District Judges including Judge Chandler. Alternatively, the Council contends that even absent petitioner's agreement on the division of cases, nonetheless the Council's action is authorized by 28 U. S. C. §§ 137 and 332.

The Solicitor General, who has filed a brief as *amicus curiae*, contends that this Court has jurisdiction to entertain the petition for a writ of mandamus or prohibition when a Judicial Council order is directed to a district judge because it acted as a judicial, not an administrative, tribunal for purposes of meeting the requirement that the case fall within this Court's appellate jurisdiction. The Solicitor General suggests that the Council is nothing more nor less than the Court of Appeals sitting *en banc*, and that the proceedings in the present case may be analogized to a disbarment.[5] From this the

---

[5] We note that nothing in the statute or its legislative history indicates that Congress intended or anyone considered the Circuit Judicial Councils to be courts of appeals *en banc*. Moreover, it should be noted that proposals to include a district judge as a member of each Circuit Judicial Council have been made; obviously, a Council so constituted could hardly be equated to an *en banc* court.

Solicitor General concludes that the case falls within the extraordinary relief available through the All Writs Act. That conclusion in turn rests on the further assumption that this Court's supervisory authority over lower courts under §§ 13 and 14 of the first Judiciary Act, 1 Stat. 80, 81, was not withdrawn when the latter two sections were repealed in favor of the All Writs Act by the revision of the Judicial Code in 1948. The Solicitor General concludes, however, that even though there is appellate jurisdiction in this Court, nonetheless it ought not to be exercised since the Order of December 13 has been superseded for four years by the Order of February 4, the terms of which have been expressly approved by petitioner. The respondent Council also urges this point.

### 3

Whether the action taken by the Council with respect to the division of business in Judge Chandler's district falls to one side or the other of the line defining the maximum permissible intervention consistent with the constitutional requirement of judicial independence is the ultimate question on which review is sought in the petition now before us. The dissenting view of this case seems to be that the action of the Judicial Council relating to assignment of cases is an impingement on judicial independence. There can, of course, be no disagreement among us as to the imperative need for total and absolute independence of judges in deciding cases or in any phase of the decisional function. But it is quite another matter to say that each judge in a complex system shall be the absolute ruler of his manner of conducting judicial business. The question is whether Congress can vest in the Judicial Council power to enforce reasonable standards as to when and where court shall be held, how long a case may be delayed in decision, whether a given case is to be tried, and many other routine matters. As to

these things—and indeed an almost infinite variety of others of an administrative nature—can each judge be an absolute monarch and yet have a complex judicial system function efficiently?

The legislative history of 28 U. S. C. § 332 and related statutes is clear that some management power was both needed and granted.[6] That is precisely what a group of distinguished chief judges and others seem to have had in mind when, in 1939, Congress was urged by Chief Justice Hughes, Chief Judge Groner, Judges Parker, Stephens and Biggs, and others to give judges a statutory framework and power whereby they might "put their own house in order."

Many courts—including federal courts—have informal, unpublished rules which, for example, provide that when a judge has a given number of cases under submission, he will not be assigned more cases until opinions and orders issue on his "backlog." These are reasonable, proper, and necessary rules, and the need for enforcement cannot reasonably be doubted. These internal rules do not come to public notice simply because reasonable judges acknowledge their necessity and abide by their intent. But if one judge in any system refuses to abide by such reasonable procedures it can hardly be that the extraordinary machinery of impeachment is the only recourse.

---

[6] Congress, by its use of the mandatory "shall" in § 332, appears to have intended that district judges carry out administrative directives of the judicial councils. Congress did not spell out procedures for giving coercive effect to council orders, and the legislative history sheds no light on whether Congress intended this statute to be implemented by regulations. Standing alone, § 332 is not a model of clarity in terms of the scope of the judicial councils' powers or the procedures to give effect to the final sentence of § 332. Legislative clarification of enforcement provisions of this statute and definition of review of Council orders are called for.

These questions have long been discussed and debated; they are not easy questions and the risks suggested by the dissents are not to be lightly cast aside. But for the reasons that follow we do not find it necessary to answer them because the threshold question in this case is whether we have jurisdiction to entertain the petition for extraordinary relief.

The authority of this Court to issue a writ of prohibition or mandamus "can be constitutionally exercised only insofar as such writs are in aid of its appellate jurisdiction. *Marbury* v. *Madison,* 1 Cranch 137, 173–80." *Ex parte Peru,* 318 U. S. 578, 582 (1943). If the challenged action of the Judicial Council was a judicial act or decision by a judicial tribunal,[7] then perhaps it could be reviewed by this Court without doing violence to the constitutional requirement that such review be appellate. As the concurring and dissenting opinions amply demonstrate, finding the prerequisites to support a conclusion that we do have appellate jurisdiction in this case would be no mean feat. It is an exercise we decline to perform since we conclude that in the present posture of the case other avenues of relief on the merits may yet be open to Judge Chandler. See *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 568–575 (1947).

Judge Chandler contends that his acquiescence in the division of business agreed upon by his fellow judges was

---

[7] We find nothing in the legislative history to suggest that the Judicial Council was intended to be anything other than an administrative body functioning in a very limited area in a narrow sense as a "board of directors" for the circuit. Whether that characterization is valid or not, we find no indication that Congress intended to or did vest traditional judicial powers in the Councils. We see no constitutional obstacle preventing Congress from vesting in the Circuit Judicial Councils, as administrative bodies, authority to make "all necessary orders for the effective and expeditious administration of the business of the courts within [each] circuit."

given under some kind of duress flowing from the Council's Order of December 13, and that it was also given as a matter of "strategy," specifically in order to avoid the appearance of an absence of agreement among the District Judges as to a division of work. By so doing he sought to avoid creating a situation in which the Council would undoubtedly have had jurisdiction under § 137. The Council, however, noting that the judges had been unable to reach agreement as to those cases previously assigned to Judge Chandler, found nonetheless that a disagreement existed. Despite his apparent acquiescence, Judge Chandler contends that his actions since then belie his words; specifically that his subsequent attack in this Court established his disagreement.

Whatever the merits of this apparent attempt to have it both ways, one thing is clear: except for the effort to seek the aid of this Court, Judge Chandler has never once since giving his written acquiescence in the division of business sought any relief from either the Council or some other tribunal.[8] Were he to disagree with the present division of business, the Judicial Council would thereupon be obliged to "make the necessary orders." 28 U. S. C. § 137. He chose to avoid that course. As MR. JUSTICE HARLAN's concurring opinion points out, Judge Chandler apparently desires to have the *status quo ante* restored without the bother of either disagreeing with the present order of the Council or persuading his fellow district judges to enter another. To say the least this is a remarkable litigation posture for a lawyer to assert in his own behalf.

---

[8] We express no opinion as to whether he could, for instance, have brought an action in the nature of mandamus to compel "an officer or employee of the United States or any agency thereof to perform a duty owed . . ." to him, 28 U. S. C. § 1361, on the theory that this was agency action.

Instead, Judge Chandler brought an immediate challenge in this Court to the Order of December 13. As noted above, *supra*, at 79, we denied any relief on the ground that that Order was "entirely interlocutory in character pending prompt further proceedings . . . and that at such proceedings Judge Chandler will be permitted to appear before the Council, with counsel . . . ." He expressly refused to attend the hearing called by the Council for February 10, 1966, in response to this Court's order; in his brief he gives as a reason that he was unwilling to "attend a hearing conducted by a body whose jurisdiction he challenged . . . ."[9] As a result of that refusal we have no record, no petition for relief addressed to any agency, court or tribunal of any kind other than this Court, and a very knotty jurisdictional problem as well.[10] Parenthetically it might be noted that Chandler could have appeared, in person or by counsel, and challenged the jurisdiction of the Council without impairing his claim that it had no power in the matter.

As noted above, and as conceded by the dissents, the Order of December 13, 1965, was terminated by the Order of February 4, 1966. Judge Chandler has twice expressed agreement with the disposition of judicial business effected by that latter Order. Nothing in this record suggests that, were he to express disagreement, relief would not be forthcoming. On the contrary, on July 12, 1967, the Council expressly invited the judges of Chandler's district to agree among themselves upon a new rule or order for the division of business, and all the judges

---

[9] Petitioner's Brief 7.

[10] Although it is not necessary to reach or decide the issue, the action of the Judicial Council here complained of has few of the characteristics of traditional judicial action and much of what we think of as administrative action. Nor are we called upon to decide whether administrative action is reviewable when it deals only with the internal operation of a court. See nn. 6, 7, *supra*.

wrote back advising the Council that "the current order for the division of business in this district is agreeable under the circumstances."

Whether the Council's action was administrative action not reviewable in this Court, or whether it is reviewable here, plainly petitioner has not made a case for the extraordinary relief of mandamus or prohibition. The motion for leave to file the petition is therefore

*Denied.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, concurring in the denial of an extraordinary writ.

This opinion sets forth my reasons for concluding (1) that the subsisting Order of the Judicial Council of February 4, 1966, raises issues that are adequately presented to this Court and should be faced by it; (2) that this Court does have jurisdiction to pass upon them; and (3) that promulgation and effectuation of the Order of February 4, 1966, are within the Council's authority, and hence this petition for an extraordinary writ should be denied. The novelty and unusual character of these questions require, regrettably, an opinion of some length.

I

I am perplexed by the Court's explanation for its failure to reach the issues presented by Judge Chandler's petition. As the Court states, the issues are whether this Court has jurisdiction to review the orders of the Judicial Council, and, if so, whether those orders are invalid because beyond the statutory and constitutional bounds of the Council's authority. The Court says, correctly I believe, that "the threshold question in this case is whether we have jurisdiction to entertain the peti-

tion for extraordinary relief." *Ante,* at 86. However, that question is never decided, and the Court's opinion closes with the statement that whether or not we have jurisdiction, "plainly petitioner has not made a case for the extraordinary relief of mandamus or prohibition." The predicate for this conclusion appears to be that Judge Chandler has an adequate remedy available before the Council, which he must invoke before seeking relief here. As authority for this unusual disposition, the Court cites only *Rescue Army* v. *Municipal Court,* 331 U. S. 549 (1947), a decision that I do not consider lends itself to the gloss the Court today places upon it.

It is clear that, although the Council's Order of December 13, 1965, has been revoked, the subsequent Order of February 4, 1966, is still outstanding and is attacked by Judge Chandler as beyond the authority constitutionally exercisable by the Council under either § 137 or § 332 of the Judicial Code. Judge Chandler has twice certified to the Council his acquiescence in the allocation of business mandated by the February 4 Order; indeed, his first certification was relied upon by the then Solicitor General, appearing for the Council in February 1966, as a basis for suggesting that the case was moot. Judge Chandler immediately responded that he did not in any way concede the Council's power to enter the February 4 Order, and that his indication of acquiescence made to the Council did not constitute such a concession. In light of this continued challenge to the order, the Solicitor General in March 1966 agreed "that the case can no longer be deemed moot."

The case thus reached the posture in which it now stands: Judge Chandler unequivocally asserts that the February 4 Order is beyond the Council's authority. If his contention were sound, the only validly outstanding directives for the allocation of business in the District

Court would be those "rules and orders" of that court, issued under § 137, that were in effect prior to December 13, 1965. Though the terms of those rules and orders are not before us, it is evident that they provided for assignment to Judge Chandler of a portion of the cases continually filed in his court. In challenging the validity of the Council's attempts to modify the previous allocation of business, and in requesting restoration of the *status quo ante,* Judge Chandler seeks to achieve a marked departure from the manner in which business is currently allocated.

Judge Chandler claims a right to accomplish this result *without* the necessity of mobilizing all the judges of his district to change the assignment of business by unanimous action, as the February 4 Order allows them to do. Further, since he denies the Council's authority to deprive him of all new business, he of course denies that he should be required to request the Council to renege as a condition of obtaining review of its outstanding order. He claims that it is illegal for the Council to deprive him of new cases, and equally so for the Council to condition his access to new cases upon his making a request to it that is tantamount to a form of a certification of disagreement under § 137.

Although the Court states that it does not decide the merits of this claim, see *ante,* at 87, I can read its opinion only as a determination that the claim is insubstantial. The Court states that it is a "remarkable litigation posture" for Judge Chandler to argue that the Council has no authority to force him to choose between remaining without new business, seeking further action by the Council, or seeking unanimous action by the District Judges. The Court denies relief because "[n]othing in this record suggests that, were he to express disagreement, relief would not be forthcoming," a decision that can only be

premised on a holding that he is denied no rights by being relegated to that course of action. *Ante,* at 87, 88–89. But this is the contrary of what Judge Chandler contends, and a conclusion with which two members of this Court sharply differ. As explained in Part III, *infra,* I too believe that Judge Chandler now lacks meritorious ground for complaint. However, I do not believe that the Court can properly make that holding without first determining its jurisdiction to consider the question.

*Rescue Army, supra,* provides no authority for such a procedure. That decision represents one branch of the long-settled doctrine that this Court will not determine constitutional questions unnecessarily or in a case that does not present them with sufficient clarity to make possible the circumspect consideration they require. See generally *id.,* at 568–585; *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 346 (1936) (Brandeis, J., concurring). Because the constitutional issues in *Rescue Army* were presented in a highly abstract and speculative form, and were clouded by factors not present in this case,[1] the Court dismissed the appeal, declining to adju-

---

[1] The appeal in *Rescue Army* involved review of a state prohibition proceeding in which was challenged, before trial, the complex state statutory scheme under which an appellant had been criminally charged. The Court observed that the meanings of the various statutory provisions, and their relationships to one another, were left undefined by the ambiguous opinion of the State Supreme Court; and since the attack was on the face of the statutes, the Court found it unclear which statutes were being challenged and even what the charges were against the appellant. In contrast, the present case involves two brief federal enactments that are challenged, not on their face, but as applied by specific orders of the Council relating to Judge Chandler.

The Court states that because the scheduled hearing below was canceled, "we have no record, no petition for relief addressed to any agency, court or tribunal of any kind other than this Court, and a very knotty jurisdictional problem as well." We do, however, have a record, consisting primarily of the several orders of the

dicate them. It concluded that an appellant there, faced with state criminal charges, would have to undergo a trial on the charges before obtaining review in this Court of his constitutional claims. As in this case, the Court's action had the effect of rejecting the appellant's claim of a right to obtain relief without further proceedings in a lower tribunal, see 331 U. S., at 584. However, the Court made that disposition only *after* carefully determining that it had jurisdiction in the case. See *id.*, at 565–568.

The Court does suggest, by footnote, an alternative basis for its refusal to consider Judge Chandler's petition. *Ante,* at 87 n. 8. If an adequate means of review of Council orders were available in the Federal District Court under 28 U. S. C. § 1361, that might justify this Court's staying its hand until such review had been sought. However, as pointed out by the United States as *amicus curiae,* it seems wholly unrealistic to suggest

---

Council and the minutes of the meetings at which it dealt with this matter. The Council's February 4 Order, unlike that of December 13, which was "entirely interlocutory," effects a change of indefinite duration in the allocation of District Court business. It was incumbent on the Council to take such action only on a record that would support it; if the record fails to support the Council's action, that does not obfuscate Judge Chandler's claims but strengthens them. His claims for the most part do not depend on his establishing from the record the existence of particular factual circumstances, cf. *DeBacker* v. *Brainard,* 396 U. S. 28 (1969), but on the alleged lack of possible justification in the record for the Council's action. Nothing in *Rescue Army* seems to justify a refusal to adjudicate the issue thus presented. I find that the February 4 Order is justified on the record in this case, see Part III, *infra.*

The significance of Judge Chandler's failure to seek review in a tribunal other than this Court depends, of course, on the resolution of the "knotty jurisdictional problem" presented by his petition to this Court. I fail to see how it justifies not reaching that question at all.

that an appropriate remedy could be obtained from a District Court. The District Court mandamus statute, § 1361, extends to "officers," "employees," and "agencies" of the United States; there is no indication that it empowers the District Courts to issue mandamus to other judicial tribunals. Thus, as the Judicial Council seems to concede, the availability of a remedy under that statute hinges on a determination, which the Court avoids making, whether the Council's actions under review were judicial or not. Brief for Respondent 19. Beyond that, direct review by a district judge of the actions of circuit judges would present serious incongruities and practical problems certainly not contemplated when § 1361 was enacted. It is unrealistic for the Court to imply that § 1361 presents an appropriate avenue of relief justifying this Court's refusal to exercise its jurisdiction.

I do not disagree with the Court that the issues presented by Judge Chandler's petition are troublesome ones that we might wish to avoid deciding. However, I can perceive no reasoned justification for the Court's refusal to decide them. Chief Justice Marshall long ago enunciated the principle that should govern us here:

> "It is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should. . . . With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens* v. *Virginia,* 6 Wheat. 264, 404 (1821).

That principle has not been abrogated by the *Rescue Army* decision, which merely undertook to define the limits of our ability to adjudicate constitutional issues in cases that adequately present them. I find no license in that decision for the action taken by the Court today.

## II

Before Judge Chandler's attack on the orders of the Judicial Council can be considered, it must be determined whether the Court possesses jurisdiction to entertain his petition for a writ of mandamus or prohibition. While I agree with my Brothers BLACK and DOUGLAS that the Court does have jurisdiction, I think that the question warrants fuller treatment than they have given it.

### A. CONSTITUTIONAL JURISDICTION

Any discussion of the scope of this Court's authority under the Constitution must take as its point of departure *Marbury* v. *Madison,* 1 Cranch 137 (1803), where the Court held that except in those instances specifically enumerated in Article III of the Constitution,[2] this Court may exercise only appellate—not original—jurisdiction. Because this suit is not cognizable as an original cause, the question initially to be faced is whether it is within our appellate jurisdiction.

The Court was asked in *Marbury* to issue a writ of mandamus to compel the Secretary of State to deliver to an appointed justice of the peace his previously signed commission. After noting that the suit did not fall within any of the enumerated heads of original jurisdiction, the Court, through Chief Justice Marshall, concluded: "To enable this court, then, to issue a *mandamus,* it must be shown to be an exercise of appellate jurisdiction, or to be necessary to enable [the Court] to exercise appellate jurisdiction." *Id.,* at 175. The Court held that issuance of mandamus to a nonjudicial federal officer would not be an exercise of appellate, but of original,

---

[2] "In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction." U. S. Const., Art. III, § 2, cl. 2.

jurisdiction. Thus the statute that purported to authorize such action by the Supreme Court was ineffective. See 2 J. Story, Commentaries on the Constitution of the United States § 1761 (5th ed. 1891).

The Chief Justice stated, as the "essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a cause already instituted, and does not create that cause." 1 Cranch, at 175. Beyond cavil, the issuance of a writ of mandamus to an inferior *court* is an exercise of appellate jurisdiction. *In re Winn,* 213 U. S. 458, 465–466 (1909). If the challenged orders of the Judicial Council in this instance were "an exercise of judicial power," this Court is constitutionally vested with jurisdiction to review them, absent any statute curtailing such review. *Williams* v. *United States,* 289 U. S. 553, 566 (1933); *Old Colony Trust Co.* v. *Commissioner,* 279 U. S. 716, 723 (1929); *In re Sanborn,* 148 U. S. 222, 224 (1893). On the other hand, if they were not, *Marbury* alone is sufficient authority to support a conclusion that this suit is beyond this Court's power under Article III. An analysis of the nature of the Council's orders must begin with consideration of the statute by which the Council was created.

The Judicial Councils of the circuits were brought into being by the Act of August 7, 1939, which was termed "An act to provide for the administration of the United States courts, and for other purposes." 53 Stat. 1223. The major purposes of the Act were to free the federal courts from their previous reliance on the Justice Department in budgetary matters, and "to furnish to the Federal courts the administrative machinery for self-improvement, through which those courts will be able to scrutinize their own work and develop efficiency and promptness in their administration of justice." H. R. Rep. No. 702, 76th Cong., 1st Sess., 2 (1939). To this end the Act established the Administrative Office

of the United States Courts, headed by a Director, to compile statistical data on the operation of the courts and to provide support services of a logistical nature.[3] The Act further established two new entities in each of the judicial circuits: the Judicial Council, composed of all the active circuit judges, and the Judicial Conference, composed of circuit and district judges along with participating members of the bar. The Council, in regular meetings, was to consider the reports of the Director and take "such action . . . thereon" as might be necessary;[4] the Conference was to meet annually "for the purpose of considering the state of the business of the courts and advising ways and means of improving the administration of justice within the circuit."[5]

As these statutory provisions indicate, Congress envisioned quite different functions for the three new bodies. The role of the Administrative Office, and its Director, was to be "administrative" in the narrowest sense of that term. The Director was entrusted with no authority over the performance of judicial business—his role with respect to such business was, and is, merely to collect information for use by the courts themselves. Chief Justice Groner of the Court of Appeals for the District of Columbia, who was chairman of the committee of circuit judges that participated in drafting the bill, stressed to the Senate Committee on the Judiciary that the bill would give the Director no "supervision or control over the exercise of purely judicial duties," because to grant such power to an administrative officer "would be to destroy the very fundamentals of our theory of government. The administrative officer [the Director] proposed in this bill is purely an administrative

---

[3] 53 Stat. 1223, as amended, 28 U. S. C. §§ 601, 604.
[4] 53 Stat. 1224, as amended, 28 U. S. C. § 332.
[5] 53 Stat. 1225, as amended, 28 U. S. C. § 333.

officer." Hearings on S. 188 before a Subcommittee of the Senate Committee on the Judiciary, 76th Cong., 1st Sess., 12 (1939) (response to question by Senator Hatch). See also *id.*, at 36 (statement of A. Holtzoff).

The Judicial Conference for each circuit was given a complementary role, again divorced from direct involvement in the disposition by the courts of their judicial business. Patterned in large part after the voluntary conferences that had been held for years in the Fourth Circuit, the Conference was intended to provide an opportunity for friendly interchange among judges and between bench and bar, out of which might grow increased understanding of problems of judicial administration and enhanced cooperation toward their solution. Its function, as indicated by the statutory language quoted above, was to be "purely advisory." See Hearings on H. R. 5999 before the House Committee on the Judiciary, 76th Cong., 1st Sess., 11–12, 17, 23–24 (1939).

The Judicial Council, on the other hand, was designed as an actual participant in the management of the judicial work of the circuit. The Act provided that, "[t]o the end that the work of the district courts shall be effectively and expeditiously transacted," the circuit judges of each circuit were to meet as a council at least twice a year. After consideration of the statistical reports submitted by the Administrative Office, "such action shall be taken thereon by the council as may be necessary. It shall be the duty of the district judges promptly to carry out the directions of the council as to the administration of the business of their respective courts." [6] This provision exists today as § 332 without

[6] This provision stated in full:

"To the end that the work of the district courts shall be effectively and expeditiously transacted, it shall be the duty of the senior circuit judge of each circuit to call at such time and place as he shall designate, but at least twice in each year, a council

relevant change, except that the 1948 revision of the Judicial Code added a declaration that "[e]ach judicial council shall make all necessary orders for the effective and expeditious administration of the business of the courts within its circuit," and correspondingly directed the district judges to carry out all such "orders." The reviser's note explained this amendment as merely a change in "phraseology," embodying in new words the original understanding of the powers of the councils. H. R. Rep. No. 308, 80th Cong., 1st Sess., A46 (1947).

The most helpful guide in determining the role envisaged for the Judicial Councils is the testimony of Chief Justice Groner, who shouldered most of the task of explaining the purposes of the bill to the committees of both Houses of Congress. He explained that under existing law the circuit judges had "no authority to require a district judge to speed up his work or to admonish him that he is not bearing the full and fair burden that he is expected to bear, or to take action as to any other matter which is the subject of criticism, . . . for which he may be responsible." Hearings on S. 188, *supra*, at 11. In contrast, under the proposed bill the Administrative Office would "observe and see that whatever is wrong in the administration of justice, from whatever sources it

---

composed of the circuit judges for such circuit, who are hereby designated a council for that purpose, at which council the senior circuit judge shall preside. The senior judge shall submit to the council the quarterly reports of the Director required to be filed by the provisions of section 304, clause (2) [now 28 U. S. C. § 604 (a) (2)], and such action shall be taken thereon by the council as may be necessary. It shall be the duty of the district judges promptly to carry out the directions of the council as to the administration of the business of their respective courts. Nothing contained in this section shall affect the provisions of existing law relating to the assignment of district judges to serve outside of the districts for which they, respectively, were appointed." 53 Stat. 1224.

may arise, is brought to the attention of the judicial council that it may be corrected, by the courts themselves." *Id.*, at 12–13.

As examples of the kinds of action a Judicial Council might be expected to take under the proposed bill, Chief Justice Groner suggested that if the statistics showed a particular district court to be falling behind in its work, the Council would "see to it, either that the particular judge who is behind in his work catches up with his work, or that assistance is given to him whereby the work may be made current." *Id.*, at 11. If it appeared that a particular judge "had been sick for 4 or 5 months and had been unable to hold any court, or had been unable, by reason of one thing or another, to transact any business, . . . immediate action could be taken to correct that situation." Hearings on H. R. 5999, *supra,* at 11. Asked by Representative Walter Chandler "what power is given there to require a judge to decide a case that he has had under advisement for months and years," he responded that the Council, after considering the matter, could issue directions that would be "final." *Id.*, at 13. Any "lazy judge's work would be reported to the council, [which] would take the correct action." *Id.*, at 27.[7]

---

[7] The testimony of Judge Parker of the Fourth Circuit was to the same effect. He explained:

"The importance of the bill, to my mind, is in unifying the administration of justice in the hands of the chief judicial officers of the courts, and clothing them with responsibility for the exercise of that power.

. . . . .

"Now, with your knowledge of human nature, you can understand it is one thing for me, as the senior circuit judge, to say to Judge Jones, 'The work is getting behind in your district. You have a number of cases that ought to be decided. I think you should decide them.' That is a very different thing from a council of all of the judges of the circuit saying, 'Judge Jones, you are

Judge Parker stated his view that

"what we have done is this, up to this point: We
have given to the Circuit Court of Appeals super-
visory power over the decisions of the district judges,
but we have given them no power whatever over
administration by the district judges.

"If Judge Jones decides a case contrary to the
views of the majority of the Circuit Court of Ap-
peals, we can tell him so and reverse him. But
if he holds a case under advisement for 2 years,
instead of deciding it promptly, there is nothing
that we are authorized by the law to do about it
in the absence of an application for mandamus.
Now, this [bill] authorizes us to do something about
it; and I agree with you that something ought to be
done about it." *Id.*, at 21.

In place of the inadequate extraordinary remedy of man-
damus, which could correct only the extreme abuse in a
particular case, the circuit judges, sitting as the Judicial
Council, were given the authority for continuous super-
vision of the flow of work through the district courts.

In short, the proposed Judicial Council was intended
to fill the hiatus of authority that existed under the
then-current arrangements, whereby the Attorney Gen-

---

behind with your work and we think that the cases that you have
under advisement ought to be decided, and we direct that they be
decided, and we will send Judge Smith into your district and he
will assist you in holding court in your district until this arrearage
is cleared up.'

. . . . .

"In other words, you would have a man speaking with authority
of law and not merely exercising his personal and persuasive
influence.

"I think that that provision for a council in each circuit is one
of the best provisions in the bill, . . . and will give the circuit judges
the power to utilize the judicial man power on each circuit to the
best advantage." *Id.*, at 20–21.

eral collected data about the operation of the courts but had no power to take corrective action, "except, perhaps, as a result of the moral suasion of his office." The proposed bill would allow compilation of more complete information, and would "provide a method, a legitimate, valid, legal method, by which, if necessary, and when necessary, the courts may clean their own house"; it would "give a body, in which the authority is firmly lodged, the power to do that and to do it expeditiously." *Id.*, at 8. See generally Report on the Powers and Responsibilities of the Judicial Councils, H. R. Doc. No. 201, 87th Cong., 1st Sess. (1961); Fish, The Circuit Councils: Rusty Hinges of Federal Judicial Administration, 37 U. Chi. L. Rev. 203 (1970).

This legislative history lends support to a conclusion that, at least in the issuance of orders to district judges to regulate the exercise of their official duties, the Judicial Council acts as a judicial tribunal for purposes of this Court's appellate jurisdiction under Article III. It seems clear that the sponsors of the bill considered the power to give such orders something that could not be entrusted to any purely "administrative" agency— not even to the Administrative Office, which was to be an arm of the judicial branch of government and under the direct control of the Supreme Court and the Judicial Conference of the United States. Chief Justice Groner, in the passage quoted above, stated that to give such power to an administrative agency "would be to destroy the very fundamentals of our theory of government." Instead, any problems unearthed by the Director's studies were to be "corrected, by the courts themselves." Hearings on S. 188, *supra,* at 12–13. See also Hearings on H. R. 5999, *supra,* at 8.

There were further references throughout the hearings and committee reports to the fact that the corrective power would be exercised by the courts themselves. *E. g.,* Hearings on S. 188, *supra,* at 16 (statement of

A. Vanderbilt); *id.*, at 31–32 (statement of Hon. Harold M. Stephens); *id.*, at 36 (statement of A. Holtz-off); H. R. Rep. No. 702, 76th Cong., 1st Sess., 4 (1939). The House report quoted with approval an endorsement of the bill by the American Judicature Society, stating that "there is no way to fortify judicial independence equal to that of enabling the judges to perform their work under judicial supervision." *Ibid.* These statements indicate that the power to direct trial judges in the execution of their decision-making duties was regarded as a judicial power, one to be entrusted only to a judicial body.

In this regard it is important to note that an earlier draft of the 1939 Act would have given responsibility for supervising the lower courts to the Supreme Court and the Chief Justice of the United States. The idea of devolving the authority to councils at the circuit level was suggested by Chief Justice Hughes, who believed that the supervision could be made most effective by "concentration of responsibility in the various circuits . . . with power and authority to make the supervision all that is necessary to induce competence in the work of all of the judges of the various districts within the circuit." H. R. Doc. No. 201, *supra,* at 3. It is equally notable that, while the draftsmen did consider giving district judges some representation on the Councils, see *id.*, at 4–5, there was apparently no thought given to including nonjudicial officers. These indications leave no doubt that the Councils' architects regarded the authority granted the Councils as closely bound up with the process of judging itself.[8]

---

[8] I find little guidance for our interpretive problem in the fact that the terms "administration" and "administrative" were sometimes used by witnesses or Congressmen to characterize the duties of the Councils. Those terms are not talismanic; they may, in various contexts, bear a range of related meanings. Certainly the phrase "judicial administration" is often used to characterize judicial tasks

Because the legislative history shows Congress intended the Councils to act as judicial bodies in supervising the district judges, there is no need to decide

performed by the courts as incidents to their primary function of rendering definitive adjudications of disputes. Since the legislative history as a whole indicates that Congress regarded the direction of the trial courts' handling of cases as a judicial function, I conclude that it used the term "administrative" in the sense in which the term is applied, for example, to many trial-court rulings that do not dispose of issues in a case but merely determine its course through the judicial process.

Nor do I find an obstacle to my construction of § 332 in Congress' failure to make express provision for the imposition of sanctions on a district judge who might contravene an order of the Judicial Council. When the question of sanctions was broached at the hearings, Chief Justice Groner stated:

"I doubt but what a judge could properly say, 'I am not going to decide this case any sooner than I choose to decide it. It is my case, and I am conducting my court, and you have no authority, except by impeachment.'" Hearings on H. R. 5999, *supra*, at 14. At this, Representative Celler reminded the witness of the provision in the bill making it the "duty" of district judges to carry out the Council's directions. The witness replied:

"I cannot conceive of a district judge anywhere, and I do not believe there is any, but, when he is admonished by this council of judges that he must do in accordance with the report made to him a particular thing to correct what is regarded as an abuse, that he will fail to do it. If he does fail to do it, then I think there would be imposed on the council the duty of bringing the matter in some way to the attention of the only power in existence, in a matter of that kind, which could apply the correct remedy; that is, the Congress of the United States." *Ibid.*

Similarly, Judge Parker, in response to a question whether the bill would "put any restraint on the council at all," stated:

"I do not think this bill does. Of course, I assume this is true: That the council will be restrained by the inherent limitations of the situation. They would know that, if they commanded a judge to do something, unnecessarily or unwisely, he would refuse to do it, and that would probably be the end of the matter."

Representative Sumners queried: "Then you are limited by what you can do to a judge in the way of punishment?" "Absolutely,"

whether placement of this authority in a nonjudicial body would violate the constitutional separation of powers, as Chief Justice Groner seems to have believed. It is sufficient to conclude from reason and analogy that this responsibility is of such a nature that it *may* be placed in the hands of Article III judges to be exercised as a judicial function.

An order by the Council to a district judge, directing his handling of one or many cases in his court, is an integral step in the progress of those cases from initial filing to final adjudication. Like the district judge's own orders setting a time for discovery or trial, or transferring a case to another district pursuant to 28 U. S. C. § 1404 (a), such an order, even though concerned with a matter of "judicial administration," is part of the official

---

replied Judge Parker. *Id.*, at 22. See also Hearings on S. 188, *supra*, at 18–19 (statement of A. Vanderbilt).

There is no need to determine in this case the correctness of these witnesses' apparent assumption that no form of discipline short of impeachment would be permissible for disobedience to an order of the Council, or of their possible assumption that such disobedience would be an impeachable offense. It seems clear that the witnesses' statements do not detract from the conclusion drawn from the rest of the legislative history, and from the language of the statute itself, that the determinations of the Judicial Council were intended to create legal duties on the part of district judges to whom they were addressed. As Judge Parker said, the Council would be "speaking with authority of law and not merely exercising [a] personal and persuasive influence." Hearings on H. R. 5999, *supra*, at 21. Even under the present statutory scheme, certain sanctions might be available in particular circumstances, such as the invalidation on appeal of orders entered by a judge in a case that had been ordered transferred from his docket. At any rate, this is only an aspect of the general problem of determining the permissible and appropriate sanctions for any kind of unlawful judicial conduct. The fact that the enforcement mechanisms are problematic does not destroy the legal nature of the Council's orders. See H. R. Doc. No. 201, *supra*, at 8; cf. *Aetna Life Ins. Co.* v. *Haworth*, 300 U. S. 227 (1937); *Nashville, C. & St. L. R. Co.* v. *Wallace*, 288 U. S. 249 (1933); n. 9, *infra*.

conduct of judicial business. Unlike the more common orders of the district court, the Council's orders involve supervision of a subordinate judicial officer. But in this regard they are not unlike the extraordinary writ of mandamus, which Judge Parker thought the Council's orders would supplement, or the orders entered by courts in proceedings for disbarment of an attorney. In short, the function of the Council in ordering the district judges to take certain measures related to the cases before them is, as the legislative history indicates Congress understood, judicial in nature.[9]

To support a contrary conclusion, respondent points to the language of Justice Holmes in *Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210, 226 (1908), defining a "judicial inquiry" as one that "investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist," as contrasted to legislation, which "looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power." The Court in *Prentis* held that a ratemaking

---

[9] For similar reasons I have little difficulty in characterizing as a "case or controversy" within the Article III judicial power a challenge to an order of the Council that regulates a district judge in the exercise of his official duties. Where, as here, the purpose and effect of the order are to restrict the judge's performance of judicial tasks, and he alleges illegal interference with the exercise of his office, his petition presents a cognizable case or controversy just as does a petition for review of the disbarment of an attorney. See Note, The Exclusiveness of the Impeachment Power under the Constitution, 51 Harv. L. Rev. 330, 334 (1937); cf. *Ex parte Bradley*, 7 Wall. 364 (1869); *Ex parte Robinson*, 19 Wall. 505 (1874); *Ex parte Wall*, 107 U. S. 265 (1883) (mandamus to review disbarment orders of lower federal courts). If a litigant in a case before the district court considered himself aggrieved by a Council order involving his case, his complaint also would seem to raise a justiciable case or controversy, although it is not necessary to decide now in what manner he might obtain review of the order.

proceeding in the Virginia State Corporation Commission was legislative in character, despite the fact that the Commission was assumed to function as a court in performing other duties. Similarly, in *United States* v. *Ferreira,* 13 How. 40 (1852), this Court concluded that the act of a district judge in passing on claims under a treaty, subject to approval by the Secretary of the Treasury, was not a judicial one; the Court held that Congress, in giving this authority to judges, referred to them by their office "merely as a designation of the persons to whom the authority is confided, and the territorial limits to which it extends." *Id.,* at 47. See also *Gordon* v. *United States,* 2 Wall. 561 (1865); *In re Metzger,* 5 How. 176 (1847); *Hayburn's Case,* 2 Dall. 409 (1792).

Respondent argues that the functions of the Judicial Council under § 332 are, under Justice Holmes' definitions, legislative, or administrative, rather than judicial; and that the statutory provision making the membership of the Council coextensive with that of the Court of Appeals for each circuit [10] is merely a means of designating the individual members by reference to their office. Certainly respondent is correct in urging that Congress' designation of circuit judges as the members of the Council does not in itself make the Council's function judicial. I think, however, that the Council's orders directing the official business of the district courts are judicial within the general definition of that term in *Prentis.* In urging that the Council's function merely "looks to the future and changes existing conditions by making a new rule," respondent disregards the fact that each of the Council's orders, such as those challenged here, is rooted in the factual circumstances of the business of a particular judge or judges and the status of a

---

[10] Compare 28 U. S. C. § 332 with 28 U. S. C. § 43 (a) and Fed. Rule App. Proc. 35 (a).

particular case or cases in the district court; and each order, if properly entered, extends only as far as the circumstances that make it "necessary . . . for the effective and expeditious administration of the business of the courts." 28 U. S. C. § 332. As noted above, the Council's orders for the handling of cases in the district court serve as one step in the progress of those cases toward judgment. Those orders can be expected to apply commonly accepted notions of proper judicial administration to the special factual situations of particular cases or particular judges.

As respondent points out, the power entrusted to the Councils by § 332, like those added by later enactments, see *infra,* at 109–110, necessarily involves a large amount of discretion; accordingly, review of the Councils' actions will usually be narrow in scope. But this does not mean that the Councils are "left at large as planning agencies." *United States* v. *First City National Bank,* 386 U. S. 361, 369 (1967). In *First City National Bank,* we were faced with a federal statute directing the courts to determine whether the anticompetitive effect of a proposed bank merger was outweighed by considerations of community convenience and need. We ruled that the courts could accept this as a "judicial task" because, like the "rule of reason," long prevalent in the antitrust field, the effect-on-competition standard was a familiar one within "the area of judicial competence." See also *United Steelworkers* v. *United States,* 361 U. S. 39 (1959). Judicial administration is a matter in which the courts even more clearly should have special competence. Within the framework of the statutes establishing the inferior federal courts and defining their jurisdiction, the Judicial Councils are charged with the duty to take such actions as are necessary for the expedition of the business of the courts in each circuit. Their discretion in this matter, while broad, does not seem to be of a different order from that possessed by district judges with respect

to many matters of trial administration. In both instances, review can correct legal error or abuse of discretion where it occurs; that the scope of review will often be very narrow does not in itself establish that the exercise of such discretion is a nonjudicial act.[11]

Respondent makes a further argument to avert a conclusion that the actions here drawn in question were judicial actions. It points out that Congress since 1939 has given the Judicial Councils many specific powers—powers that respondent considers so clearly nonjudicial as to negate any inference that the Council serves as a "judicial" body within the purview of Article III. Those powers include the power to order a district judge, where circumstances require, to reside in a particular part of the district for which he is appointed, 28 U. S. C. § 134(c); to make any necessary orders if the district judges in any district are unable to agree upon the division of business among them, 28 U. S. C. § 137; to consent to the pretermission of any regular session of a District Court for insufficient business or other good cause, 28 U. S. C. § 140 (a); to approve as necessary the provision of judicial accommodations for the courts by the General Services Administration, 28 U. S. C. § 142; to consent to the designation and assignment of circuit or district judges to sit on courts other than those for which they are appointed, 28 U. S. C. § 295; to certify to the President

_____

[11] It should be noted that virtually all of the additional powers that have been conferred on the Councils by provisions of the Judicial Code other than § 332, see *infra*, define the Council's tasks in terms commonly used as standards for judicial determination. See 28 U. S. C. § 134 (c) ("[i]f the public interest and the nature of the business of a district court require"), § 137 ("necessary orders"), § 142 ("court quarters and accomodations . . . approved as necessary"), § 372 (b) ("judge . . . unable to discharge efficiently all the duties of his office by reason of permanent mental or physical disability"); 11 U. S. C. § 62 (b) ("[r]emoval . . . for incompetency, misconduct, or neglect of duty").

that a circuit or district judge is unable to discharge efficiently all the duties of his office by reason of permanent mental or physical disability, thus authorizing the President to appoint an additional judge, 28 U. S. C. § 372 (b); to direct where the records of the courts of appeals and district courts shall be kept, 28 U. S. C. § 457; to approve plans for furnishing representation for defendants under the Criminal Justice Act, 18 U. S. C. § 3006A (a); and to take various actions in regard to referees in bankruptcy, including removal of a referee for cause, 11 U. S. C. §§ 62 (b), 65 (a), (b), 68 (a), (b), (c), 71 (b), (c).

While many of these powers are trivial in comparison with the courts' basic responsibility for final adjudication of lawsuits, I am not persuaded that their possession is inconsistent with a conclusion that the Council, when performing its central responsibilities under 28 U. S. C. § 332, exercises judicial power granted under Article III. Cf. *Glidden Co.* v. *Zdanok,* 370 U. S. 530, 580–582 (1962) (opinion of HARLAN, J.). In the first place, the respondent concedes that at least one of these enumerated powers—the power to remove referees for cause—"can properly be regarded as judicial," and it is not at all clear that any of them is beyond the range of the permissible activities of an Article III court. In *Textile Mills Corp.* v. *Commissioner,* 314 U. S. 326, 332 (1941), the Court noted the range of relatively minor responsibilities, other than the hearing of appeals, placed by statute in the courts of appeals. These included prescribing the form of writs and other process and the form and style of the courts' seals; making rules and regulations; appointing a clerk and approving the appointment and removal of deputy clerks; and fixing the times when court should be held. Each of these functions was to be performed by the "court." While it is

possible that the performance of some of them might never produce a case or controversy reviewable in this Court, they are reasonably ancillary to the primary, dispute-deciding function of the courts of appeals. Just as the Court in *Textile Mills* did not question the authority of Congress to grant such incidental powers to the courts of appeals, I see little reason to believe that any of the various supervisory tasks entrusted to the Judicial Council is beyond the capacities of a judicial body under Article III.

In the second place, my conclusion about the nature of the Council's primary function under § 332 would stand even if it were determined that one or more of the Council's assorted incidental powers were incapable of being exercised by an Article III court. If I am correct in concluding that Congress' purpose in 1939 in creating the Judicial Councils was to vest in them, as an arm of the Article III judiciary, supervisory powers over the disposition of business in the district courts, that purpose is not undone by a subsequent congressional attempt to give them a minor nonjudicial task; it would be "perverse to make the status of [the Councils] turn upon so minuscule a portion of their purported functions." *Glidden Co.* v. *Zdanok,* 370 U. S., at 583.

### B. Statutory Jurisdiction

This Court does not, of course, necessarily possess all of the appellate jurisdiction permitted to it by Article III. That article provides that our appellate jurisdiction is to be exercised "with such Exceptions, and under such Regulations as the Congress shall make," and this language has been held to give Congress the power, within limits, to prescribe the instances in which it may be exercised. *E. g., Ex parte McCardle,* 7 Wall. 506, 512–513 (1869). I turn, therefore, to the Judicial Code

to determine our statutory authority to consider Judge Chandler's petition.

Congress in the Code has not spoken, one way or the other, regarding review of the orders of Judicial Councils. Petitioner asserts that the Court has power to issue mandamus or prohibition to the Councils under the All Writs Act, 28 U. S. C. § 1651 (a), which provides that

> "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

This statute has been construed to empower this Court to issue an extraordinary writ to a lower federal court in a case falling within our statutory appellate jurisdiction, where the issuance of the writ will further the exercise of that jurisdiction. See, *e. g., De Beers Consolidated Mines, Ltd.* v. *United States,* 325 U. S. 212, 217 (1945); *United States Alkali Export Assn.* v. *United States,* 325 U. S. 196, 201–204 (1945). It is now settled that the case need not be already pending in this Court before an extraordinary writ may be issued under § 1651 (a); rather, the Court may issue the writ when the lower court's action might defeat or frustrate this Court's *eventual* jurisdiction, even where that jurisdiction could be invoked on the merits only after proceedings in an intermediate court. See, *e. g., De Beers Consolidated Mines, Ltd.* v. *United States,* 325 U. S., at 217; *Ex parte Peru,* 318 U. S. 578 (1943); *Ex parte United States,* 287 U. S. 241, 248–249 (1932); *McClellan* v. *Carland,* 217 U. S. 268 (1910); cf. *FTC* v. *Dean Foods Co.,* 384 U. S. 597 (1966); *Roche* v. *Evaporated Milk Assn.,* 319 U. S. 21 (1943). But cf. *In re Glaser,* 198 U. S. 171, 173 (1905); *In re Massachusetts,* 197 U. S. 482, 488 (1905).

Each of the prior cases in which this Court has invoked § 1651 (a) to issue a writ "in aid of [its jurisdiction]" has involved a particular lawsuit over which the Court would have statutory review jurisdiction at a later stage. By contrast, petitioner's reliance on this statute is bottomed on the fact that the action of the Judicial Council "touches, through Judge Chandler's fate, hundreds of cases over which this Court has appellate or review jurisdiction." Petition for Writ of Prohibition and/or Mandamus 13. He argues that the Council's orders, allocating to other judges in his district cases that would otherwise be decided by him, constitute a usurpation of power that cannot adequately be remedied on final review of those cases by certiorari or appeal in this Court. The United States as *amicus curiae* agrees that this claim properly invokes the Court's power to consider whether mandamus or prohibition should be granted.[12] Although this expansive use of § 1651 (a) has no direct precedent in this Court, it seems to me wholly in line with the history of that statute and consistent with the manner in which it has been interpreted both here and in the lower courts.

Chief Justice Stone, writing for the Court in *Ex parte Peru,* 318 U. S., at 583, characterized the "historic use of writs of prohibition and mandamus directed by an appellate to an inferior court" as that of "confining the inferior court to a lawful exercise of its prescribed jurisdiction, or of compelling it to exercise its authority when it is its duty to do so." The bounds of this Court's

---

[12] Respondent Judicial Council agrees, for "substantially the reasons advanced by the Solicitor General," that § 1651 provides statutory authority for exercise of jurisdiction in this proceeding, if the proceeding is within the permissible appellate jurisdiction of this Court under Article III. Like the *amicus* United States, however, respondent notes that the question is not free from doubt. It is incumbent upon the Court to consider the question even in the absence of disagreement between the parties.

discretionary power to issue such writs were further stated in *Parr* v. *United States,* 351 U. S. 513, 520–521 (1956):

> "The power to issue them is discretionary and it is sparingly exercised. . . . This is not a case where a court has exceeded or refused to exercise its jurisdiction, see *Roche* v. *Evaporated Milk Assn.,* 319 U. S. 21, 26, nor one where appellate review will be defeated if a writ does not issue, cf. *Maryland* v. *Soper,* 270 U. S. 9, 29–30. Here the most that could be claimed is that the district courts have erred in ruling on matters within their jurisdiction. The extraordinary writs do not reach to such cases; they may not be used to thwart the congressional policy against piecemeal appeals. *Roche* v. *Evaporated Milk Assn., supra,* at p. 30." [13]

In *Parr,* the petitioner's claim was simply that a district court had erred in dismissing an indictment at the Government's request after the Government had obtained a new indictment for the same offenses in another district. In contrast, the present case involves a claim that the Council's orders were entered in a matter entirely beyond its jurisdiction. Judge Chandler claims that the order of December 13, 1965, depriving him of both pending and future cases, was tantamount to his removal from office, and that such an act far exceeded the limited jurisdiction over "administrative" matters conferred on the Council by § 332. He further asserts, as noted in Part I, *supra,* that the order of February 4, 1966, exceeded the Council's jurisdiction under either § 332 or § 137. Such grave charges clearly go beyond a mere claim that the Council has "erred in ruling on matters within [its] jurisdiction." Cf. *Will*

---

[13] See also *Will* v. *United States,* 389 U. S. 90 (1967); *Bankers Life & Cas. Co.* v. *Holland,* 346 U. S. 379, 382–383 (1953).

v. *United States,* 389 U. S. 90, 95–96, 98 and n. 6 (1967); *Schlagenhauf* v. *Holder,* 379 U. S. 104 (1964).

Further, there seems to be no means by which Judge Chandler's challenge to the orders could be aired adequately on review of the cases to which they pertain. While the losing party in a case assigned to another district judge might conceivably argue on appeal that he is entitled to reversal because his case should have been heard by Judge Chandler, such an argument would encounter formidable obstacles. A reviewing court would have no way of determining whether a particular case filed in the District Court after the February 4 Order would, but for that order, have been assigned to Judge Chandler; nor is it clear that the error, if detectable, would in itself entitle the losing party to invalidate proceedings had before another judge. More basically, Judge Chandler is asserting an injury to himself, apart from any injuries to the parties in those cases; the parties cannot be relied upon to seek vindication of that injury. Cf. *Ex parte Fahey,* 332 U. S. 258, 260 (1947); *Ex parte Harding,* 219 U. S. 363, 372–380 (1911).

It is difficult to see how the very multiplicity of the cases affected by the Council's orders could derogate from this Court's authority under § 1651 (a) to issue an extraordinary writ in aid of its appellate jurisdiction over them. A somewhat analogous multiplicity was found to militate in favor of the issuance of mandamus in *McCullough* v. *Cosgrave,* 309 U. S. 634 (1940), and in *Los Angeles Brush Corp.* v. *James,* 272 U. S. 701 (1927). As later explained by Mr. Justice Brennan, dissenting in *La Buy* v. *Howes Leather Co.,* 352 U. S. 249, 266 (1957),

> "*Los Angeles Brush Corp.* was a case where a reference [to a master] was made, not because a district judge decided that the particular circumstances of the particular case required a reference, but pur-

suant to an agreement among all the judges of that District Court always to appoint masters to hear patent cases regardless of the circumstances of particular cases."

Mandamus was therefore issued in *Los Angeles Brush Corp.*, and in *McCullough,* which involved a similar situation in the same District Court, in order to remedy a pervasive disregard of the Rules of Civil Procedure affecting numerous cases.[14]

Similarly, in *La Buy* the Court upheld the authority of the Court of Appeals under § 1651 (a) to issue writs of mandamus compelling a district judge to rescind his referral of two antitrust cases to a master for trial. The Court found that the referral "was a clear abuse of discretion," and further noted "that the Court of Appeals has for years admonished the trial judges of the Seventh Circuit that the practice of making references 'does not commend itself' . . . [and that it was] 'all too common in the Northern District of Illinois.'" 352 U. S., at 257, 258. This factor was primary among the "exceptional circumstances" found to warrant the Court of Appeals' issuance of the writs.

In the reported case most nearly analogous to this one, the Court of Appeals for the Third Circuit issued a writ of mandamus at the behest of the United States to compel a district judge to return to the judicial office from which he had been unlawfully removed. *United States* v. *Malmin,* 272 F. 785 (C. A. 3d Cir. 1921). Judge Malmin, of the District Court of the Virgin Islands, had returned to the United States after the

---

[14] The Court in *Los Angeles Brush Corp.* relied upon its mandamus power under § 234 of the Judicial Code of 1911, a provision that may no longer be in effect, see n. 15, *infra.* However, since the case was one that would be reviewable on certiorari at a later stage, it seems that § 262 (now carried forward in § 1651) was equally applicable. The *per curiam* opinion in *McCullough* did not disclose the statutory basis for the ruling there.

territorial governor had purported to remove him and appoint another to his seat. Relying on § 262 of the Judicial Code of 1911, a predecessor of the All Writs Act, the court ruled that it had authority to issue the writ "in aid of" its jurisdiction, *id.*, at 791; it observed that the absence of a lawfully appointed judge of the District Court affected the rights of litigants in cases reviewable in the Court of Appeals, and that "the right of the public to a properly constituted trial court from which appeals can validly lie could not be asserted or brought about in proceedings on appeal or by writ of error." In those circumstances, the court deemed it "essential to the appellate jurisdiction of this court that orderly proceedings in the District Court of the Virgin Islands be restored." *Id.*, at 792.

A dissenter in *Malmin* disagreed with the majority's conclusion that the defect could not be rectified on appeal, and urged that mandamus should not issue because it could not bind the succeeding appointee, who was not a party. In the case before us, as noted above, the ordinary appeals are not adequate to protect Judge Chandler's interest; and there is no problem of missing parties, since it is the judge himself who is complaining of illegal interference with the exercise of his office, and that complaint can be remedied fully by the issuance of a writ against respondent Judicial Council.

For these reasons I would conclude that the actions challenged by Judge Chandler sufficiently affect matters within this Court's appellate jurisdiction to bring his application for an extraordinary writ within our authority under § 1651 (a), and that his charges, if sustained, would present an appropriate occasion for the issuance of such a writ.[15]

---

[15] In many of the early mandamus cases in this Court, such as *Ex parte Peru, supra*, the Court based its action on both § 234 and § 262 of the Judicial Code of 1911, the predecessors of

118

## III

In the present posture of this case Judge Chandler, in my opinion, is not entitled to the relief he seeks. The Order of December 13, 1965, which prompted his recourse to this Court, has been superseded by the Order

§ 1651 (a). The Court usually did not specify whether it relied upon § 234 or § 262, apparently considering that they furnished overlapping authority. Section 234, which derived from § 13 of the Judiciary Act of 1789, conferred upon this Court, and this Court only, the "power to issue . . . writs of mandamus, in cases warranted by the principles and usages of law, to any courts appointed under the authority of the United States . . . ." Section 262 provided that "[t]he Supreme Court, the circuit courts of appeals, and the district courts shall have power to issue all writs not specifically provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the usages and principles of law." The former provision was construed as conferring upon this Court "a general supervisory power over the inferior courts, so far as this power was exercisable through a writ of mandamus in its historic function," enabling the Court "to exercise the essentially appellate function of reviewing and revising a judicial proceeding in a lower court by appropriate use of the common-law writ of mandamus, whether or not it had been given by Congress some other statutory appellate jurisdiction, or potential appellate jurisdiction, by way of an appeal or writ of error or otherwise." *In re Josephson*, 218 F. 2d 174, 177–178 (C. A. 1st Cir. 1954). See, *e. g., Virginia* v. *Rives*, 100 U. S. 313, 323–324 (1880); *Ex parte Bradley*, 7 Wall. 364, 375–377 (1869); *Ex parte Crane*, 5 Pet. 190 (1831). In contrast, the power granted by § 262 was not an independent appellate power but merely an auxiliary power exercisable when appellate jurisdiction was granted by some other provision of law.

These two provisions were consolidated into § 1651 (a) as part of the 1948 revision of the Judicial Code. The brief Reviser's Note explained that the "revised section extends the power to issue writs in aid of jurisdiction, to all courts established by Act of Congress, thus making explicit the right to exercise powers implied from the creation of such courts." The "special provisions" of § 234 relating to the Supreme Court "were omitted as unnecessary in view of the revised section." H. R. Rep. No. 308, 80th Cong., 1st Sess., A144–

of February 4, 1966, which I am satisfied is entirely within the authority of the Council. I am wholly unable to regard the latter order either as a "removal" of Judge Chandler from judicial office, or as anything other than an effort to move along judicial traffic in the District Court. In this state of affairs, I can find no room for the constitutional argument so vigorously made by my Brothers BLACK and DOUGLAS.

## A

Petitioner strenuously attacks the substance of the December 13 Order, which he claims effectively re-

---

A145 (1947). Because the language of § 1651 (a) more closely resembles that of § 262, it has been speculated that Congress by enacting the revision may have withdrawn from this Court its special appellate power under § 234 to supervise proceedings in the lower federal courts without regard to whether any other statute gives the Court jurisdiction to review those proceedings. See *La Buy* v. *Howes Leather Co.,* 352 U. S. 249, 260 (1957) (BRENNAN, J., dissenting); *In re Josephson, supra.*

The United States as *amicus* urges the Court to rule that no such change was effected by the 1948 revision, arguing correctly that § 234 would clearly encompass the type of review Judge Chandler seeks. The United States points out, in support of such a ruling, that the Reviser's Note stated that § 1651 (a) "consolidates" the earlier provisions, "with necessary changes in phraseology"; this gave no indication that a significant change in the law was intended, and one should not lightly be inferred. I note that the Court in *Ex parte Peru,* referring to both § 234 and § 262, stated that "[u]nder the statutory provisions, the jurisdiction of this Court to issue common-law writs in aid of its appellate jurisdiction has been consistently sustained." 318 U. S., at 582–583. Its use of the expression "in aid of its appellate jurisdiction" to characterize both statutes suggests that the similar phrase in § 1651 (a) may also encompass the powers exercised by this Court under § 234. However, there is no need to decide this question here in light of the fact that the reviewability in this Court of the many cases whose allocation is determined by the Judicial Council's orders brings Judge Chandler's petition within the Court's powers as they existed under § 262.

moved him from office, as well as the procedures under which the order was issued. His substantive argument is that § 332, on which the Council relied, does not authorize the placing of restrictions upon the functioning of a district judge, even temporarily, and that if it does the statute is unconstitutional because the constitutional provisions [16] vesting in Congress authority to impeach federal officers, including judges, establish the exclusive means of inquiry into the fitness of a federal judge to perform his duties. In response the United States as *amicus* argues that the impeachment provisions should not be read as precluding legislation that would authorize supervision of federal judges by "judicial trial of the fulfillment of the condition of federal judicial tenure under Article III—that the judge maintain his 'good behavior.'" This question has been the subject of scholarly debate, and is presently before the Senate as it considers the proposed Judicial Reform Act. See Hearings on S. 1506–S. 1516 before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 91st Cong., 1st Sess. (1969). Petitioner's procedural objections to the December 13 Order relate to its issuance *ex parte,* without notice or hearing—circumstances that raise serious questions under the Due Process Clause of the Fifth Amendment.

I believe the respondent and the United States are correct in contending that these issues need not be resolved on this occasion. As already appears, the December 13 Order is no longer before us. Therefore, the only question still requiring decision is the validity of the outstanding February 4 Order under the enabling statutes.

### B

The Council rested the February 4 Order on its authority under both § 137 and § 332. Considering first the

---

[16] See U. S. Const., Art. I, §§ 2, 3; Art. II, § 4.

Council's more general grant of authority, § 332, I think this order was substantively within the powers conferred by that provision. The order was designed to deal with the situation in Judge Chandler's court by requiring him to dispose of his backlog before notifying the Council that he is willing and able to undertake new assignments. See Supplemental Memorandum for Respondent. That the Councils might issue orders of this type was clearly contemplated by the draftsmen of § 332, and such orders seem to have been a customary measure taken by the Councils under the section.

The legislative history of § 332, summarized in Part II above, makes clear that a Judicial Council's mandate to "make all necessary orders for the effective and expeditious administration of the business of the courts within its circuit" was intended to encompass the making of orders that would direct a district judge to clear up his docket or would channel cases to other judges when a situation existed with respect to one judge that was inimical to the effective administration of justice. Cf. Vinson, The Business of Judicial Administration: Suggestions to the Conference of Chief Justices, 35 A. B. A. J. 893, 895 (1949).

The Judicial Conference of the United States made a study in 1961 of the role of the Judicial Councils, culminating in a report that was transmitted to Congress by Chief Justice Warren. That report, after thorough consideration of the legislative history of the 1939 Act, specifically listed as among the responsibilities of the Councils "having a judge who has an accumulation of submitted cases not take on any further trial work until such cases have been decided." H. R. Doc. No. 201, *supra*, at 10. This power has been exercised on other occasions by other Judicial Councils. See, *e. g.*, Fish, *supra*, 37 U. Chi. L. Rev., at 230; Lumbard, The Place of the Federal Judicial Councils in the Administration

of the Courts, 47 A. B. A. J. 169, 170–171 (1961); Shafroth, Modern Developments in Judicial Administration, 12 Am. U. L. Rev. 150, 160 (1963). The propriety of such action has apparently never before been seriously challenged.

Judge Chandler argues, however, that § 332 limits the Council's authority in making this type of order to situations in which the order is necessitated by the existence of an extraordinary backlog of cases, and that the February 4 Order was prompted, not by such a backlog, but by the Council's desire to punish Judge Chandler for misbehavior. There seem to be two strands to this argument. First, there are suggestions in petitioner's briefs and in those of *amicus curiae* Shipley that the Council's actions have been taken, not for the reasons stated in the various orders and minutes of the Council, but for reasons of personal animosity. There is nothing in the record, which consists of Judge Chandler's petition and the orders and minutes of the Council, to substantiate this charge, and I for one am quite unwilling to attribute such motives to the Council. Second, Judge Chandler seems to assert that the February 4 Order is sustainable only if supported by a showing that his docket bore a numerically heavier load of pending cases than did those of his colleagues on the District Court, and that this justification is lacking here.[17] I believe

[17] Although neither the December 13 Order nor the February 4 Order recited figures concerning the status of the docket in the District Court, the former order did state that it was predicated on a series of meetings over a four-year period in which the Council "has discussed and considered the business of the United States District Court for the Western District of Oklahoma and has done so with particular regard to the effect thereon of the attitude and conduct of Judge Chandler who, as the Chief Judge of that District, is primarily responsible for the administration of such business."

Approximately a year after the issuance of the February 4 Order, in the course of determining "whether the existing order was still

this argument reflects an overly restrictive view of the Judicial Council's role.

The legislative history of § 332 contains positive refutation of petitioner's argument that the only factor a Council might appropriately consider in making an order such as that of February 4 is the statistical weight of the workloads of the various district judges. It is true, as the legislative history in Part II above confirms, that abatement of delays in disposition of cases was a principal purpose for creation of the Councils; but the Councils were deliberately given broad responsibilities to meet other problems as they arose. Chief Justice Groner contemplated that the Councils would cope not only with delays but also with "any other matter which is the subject of criticism, or properly could be made the subject of criticism, for which [a district judge] may be responsible." Hearings on S. 188,

---

suitable or whether the conditions had changed to an extent sufficient to dictate a change in the order," the Council examined statistics furnished by the Administrative Office of the United States Courts, showing that on February 1, 1966, 138 cases had been pending before Judge Chandler, as contrasted to 92, 91, and 99 cases respectively pending before the other active district judges. Further statistics showed that 50 cases were still pending before Judge Chandler on January 31, 1967. On the basis of these figures the Council determined that no action was then appropriate regarding the assignment of cases in the District Court.

On July 12, 1967, the Council again reviewed the condition of the District Court docket and, on discovering that only 12 cases were pending before Judge Chandler, determined that a revision should be made of the disposition of business mandated by the February 4 Order. It requested notification from the district judges of a new order of business suitable to them. However, as appears from the Court's opinion, the district judges advised the Council "that the current order for the division of business in this district is agreeable under the circumstances." On receiving this message the Council determined to leave the February 4 Order in effect. Subsequent statistics, submitted to the Council by the Administrative Office, showed that Judge Chandler had six cases pending on June 30, 1969.

124

*supra,* at 11. The Senate committee included this part of the testimony in its report recommending passage of the bill. S. Rep. No. 426, 76th Cong., 1st Sess., 3 (1939). The same witness later stated that the Council's responsibilities would embrace correction of "whatever is wrong in the administration of justice, from whatever sources it may arise," as a means of promoting "the strengthening of confidence on the part of the people." Hearings on S. 188, *supra,* at 12–13, 14.[18]

The broad mandate of the Councils was further stressed by the Judicial Conference in its 1961 report. The Conference considered it to be "patent" from the legislative history that § 332

> "imposed upon a judicial council the responsibility of seeing that the work and function of the courts in its circuit were expeditiously and effectively performed; and that this responsibility of observation, supervision, and correction went to the whole of a court's functioning, in both personal and institutional aspect." H. R. Doc. No. 201, *supra,* at 6.

From a study of the applications of the statute by the various Councils, the Conference concluded that

> "most of the councils appear, from the things with which they have dealt in these situations, to have recognized that their responsibilities and power extend, not merely to dealing with the questions of the handling and dispatching of a trial court's business in its technical sense, but also to dealing with the business of the judiciary in its broader or institutional sense, such as the preventing of any stigma, disrepute, or other element of loss of public confidence occurring as to the Federal courts or to the

---

[18] See also Hearings on H. R. 5999, *supra,* at 16 (statement of Chief Justice Groner); *id.,* at 22 (statement of Judge Parker).

administration of justice by them, from any nature of action by an individual judge or a person attached to the courts." *Id.,* at 7.

The Conference specifically approved this construction in spelling out its conclusions. *Id.,* at 8–9.

It is not necessary to define all of the limits on the powers of the Councils under § 332 in order to determine that the February 4 Order was a proper exercise of those powers. The December 13 Order noted that the Council was familiar with Judge Chandler's conduct of official business from four years of scrutiny, and it further recited that

> "[d]uring that period Judge Chandler has been a party defendant in both civil and criminal litigation. One civil case is still pending. Two proceedings have been brought in the United States Court of Appeals for the Tenth Circuit to disqualify him from handling specific litigation. In one instance he was ordered to proceed no further and the other is still pending."

I believe that these circumstances, taken as a whole, established a prima facie basis for the Council's conclusion that some action was appropriate to alleviate what the Council members perceived as a threat to public confidence in the administration of justice.

## C

Passing over the now-revoked action taken on December 13, I consider the February 4 Order, restricting Judge Chandler for the time being to the cases then pending before him, to be a permissible interim step toward exploration and solution of the problem presented. The Council must be presumed to have known of the substantial number of cases then available to Judge Chandler, see n. 17, *supra,* and it could reasonably have

concluded that a careful way to proceed would be to observe the manner in which Judge Chandler handled those cases before determining what more permanent steps should be taken with respect to the administration of the business of the District Court.

When the Council learned that Judge Chandler had disposed of the bulk of his cases, it invited him and the other district judges to propose a new distribution of business; the district judges together, or Judge Chandler alone exercising his right under § 137 to certify a disagreement to the Council, could make such a proposal at any time. Judge Chandler's claim that his failure to seek a new allocation is the result of unlawful "duress" seems insubstantial in light of the initial validity of the February 4 Order. Even if the December 13 Order did impose a form of duress in January 1966, when the district judges settled upon the present division of cases, that order had been revoked, and there could hardly be said to have been duress, when the district judges declined the Council's July 1967 invitation to propose a new order. Serious questions would be presented if, after exhausting much of his pending business, Judge Chandler had sought additional business and the Council had declined without advancing substantial additional justification for the refusal. However, because of Judge Chandler's inaction, that situation is not presented on this record.

In view of my conclusion that the February 4 Order was a valid exercise of the Council's power under § 332, I need not consider the Council's alternative justification of the order under § 137, or petitioner's arguments concerning the inapplicability of that provision.

## D

Finally, the procedures followed by the Council in promulgating its February 4 Order do not appear to have

been offensive to Congress' conception of the manner in which the Councils would act, or inconsistent with the basic demands of due process of law. It seems to have been assumed throughout the consideration of the 1939 Act that, at least on relatively minor matters, the Councils would ordinarily proceed *ex parte*. See, *e. g.*, hearings on H. R. 5999, *supra*, at 14 (statement of Chief Justice Groner). Beginning with the initial suggestion by Chief Justice Hughes, one of the major reasons for placing these responsibilities in a body of circuit judges was that they would have a great deal of firsthand knowledge about the district courts and about the work and conduct of the individual district judges. See H. R. Doc. No. 201, *supra*, at 3 (Chief Justice Hughes); Hearings on S. 188, *supra*, at 16 (statement of A. Vanderbilt). The other major source of the information on which the Councils would act was to be the data gathered by the Administrative Office.

However, the statute, which uses very general language to vest heavy responsibilities in the Councils, certainly allows the Councils the flexibility to vary their procedures, adopting in a particular instance those that are especially suited to the matter at hand or necessitated by the demands of fairness. See Fish, *supra*, at 222. There is much in our tradition of due process of law that runs counter to the taking of serious action on the basis of *ex parte* assertions or suspicions of misbehavior or incapacity. Apparently recognizing this, the Council after its temporary December 13 Order scheduled a hearing on the question of assignment of cases to Judge Chandler, and invited him to appear with counsel. Cf. *Chandler* v. *Judicial Council*, 382 U. S. 1003 (1966). As explained in the opinion of the Court, this hearing was canceled when the Council learned that no judge of the District Court wished to appear. In these circumstances the

Council, it seems to me, was justified in issuing the February 4 Order without further proceedings.

Petitioner challenges this conclusion in several ways. First, he argues that the order directing the hearing, entered January 27, 1966, did not contain adequate notice of the subject matter of the hearing. That order expressly referred to the December 13 Order and to Judge Chandler's attack upon it in this Court, and declared that "this matter" would be set for a hearing at which Judge Chandler might "present such matters to the Council as he may deem fit." [19] In view of the fact that the December 13 Order had listed specific grounds on which the Council's action was based, and Judge Chandler made no request for further specification, I cannot consider his present contention well taken.

Second, petitioner states that his boycott of the hearing was based on his denial that the Council had any jurisdiction to hold it. He apparently concludes from this that the February 4 Order stands as though the Council had never scheduled a hearing at all. However, the Council had already entered the December 13 Order,

---

[19] The order stated, in pertinent part:

"The Council gave consideration to its December 13, 1965, order in this matter, to the proceedings in the Supreme Court entitled 'Honorable Stephen S. Chandler, etc. v. Judicial Council . . . ,' to the motion for stay filed therein by the petitioner, to the response thereto by the Solicitor General of the United States, and to the order of the Supreme Court entered on January 21, 1966. The Council noted the reference by the Supreme Court to the statement in the response of the Solicitor General that the Council contemplated prompt further proceedings and the order of the Supreme Court that the application for stay be denied 'pending this contemplated prompt action of the Judicial Council.'

"It is ordered that this matter is set for hearing at 9:30 A. M., Thursday, February 10, 1966, in Room 5009 of the United States Courthouse at Oklahoma City, Oklahoma, when and where the Honorable Stephen S. Chandler may appear in person and with counsel and present such matters to the Council as he may deem fit."

which this Court had declined, at least temporarily, to disturb, and the Council's authority to proceed further was surely sufficiently evident that Judge Chandler was not entitled to remain indifferent to its order setting the matter for a hearing. Finally, petitioner asserts that the proposed hearing was deficient because he was merely invited, rather than ordered, to appear. He cites no authority for this proposition, and it appears quite untenable.

Throughout Judge Chandler's briefs, and in the dissents of my Brothers BLACK and DOUGLAS, there are strong assertions of the importance of an independent federal judiciary. I fully agree that this principle holds a profoundly important place in our scheme of government. However, I can discern no incursion on that principle in the legislation creating the Judicial Councils and empowering them to supervise the work of the district courts, in order to ensure the effective and expeditious handling of their business. The February 4 Order, entered pursuant to this statutory authority, is a supportable exercise of the Council's responsibility to oversee the administration of federal justice.

I would grant Judge Chandler's motion for leave to file his petition for a writ of prohibition or mandamus, but for the reasons stated above I am of the opinion that no such writ should issue.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

The Congress, which created the lower federal courts, also created a Judicial Council for each circuit composed "of the circuit judges for the circuit, in regular active service." 28 U. S. C. § 332. The Council "shall make all necessary orders for the effective and expeditious administration of the business of the courts within its circuit." *Ibid.* And Congress directed that "[t]he dis-

trict judges shall promptly carry into effect all orders of the judicial council." *Ibid.*

Petitioner, Stephen S. Chandler, is a federal district judge of the Tenth Circuit. On December 13, 1965, the Council, composed of five judges of the Court of Appeals, entered an order that "until the further order of the Judicial Council, the Honorable Stephen S. Chandler shall take no action whatsoever in any case or proceeding now or hereafter pending in the United States District Court for the Western District of Oklahoma; that all cases and proceedings now assigned to or pending before him shall be reassigned to and among the other judges of said court; and that until the further order of the Judicial Council no cases or proceedings filed or instituted in the United States District Court for the Western District of Oklahoma shall be assigned to him for any action whatsoever."

Petitioner filed a petition for prohibition and/or mandamus, and sought a stay of the order of the Council. The Court denied relief stating that the order was "entirely interlocutory in character pending prompt further proceedings." 382 U. S. 1003. MR. JUSTICE BLACK and I dissented. On February 4, 1966, the Council entered an order allowing petitioner to continue to sit on cases filed and assigned as of December 28, 1965; but it apportioned all subsequent cases among the remaining judges. The Council stated that its order of February 4, 1966, superseded its order of December 13, 1965. By a subsequent order the Council directed that new judicial business would not, until further order, be assigned to petitioner.

## I

This case has been and continues to be the liveliest, most controversial contest involving a federal judge in modern United States history.

The order of February 4, 1966, was made by the Council on the basis of an alleged "disagreement" among the district judges on one side and Judge Chandler on the other over the reassignment of cases previously assigned to Judge Chandler on December 28, 1965. The Council authorized Judge Chandler to sit on cases assigned to him prior to December 28, 1965; and it assigned to the other district judges all cases filed after that date.

Judge Chandler on the eve of that order, January 24, 1966, agreed to acquiesce in the assignment of new cases to the other district judges. But he disagreed with any action concerning "my pending cases." As to them he said: "There is no provision of law that grants a Judicial Council jurisdiction over cases pending before a judge in the various stages of the judicial process after valid assignment to him. I consider it my duty to continue to assert my exclusive jurisdiction over these cases, and shall do so."

Since the order of February 4, 1966, said that all cases "assigned to Judge Chandler as of December 28, 1965, shall remain assigned to him," and since Judge Chandler did not object to the later cases being assigned to others, the then Solicitor General (now MR. JUSTICE MARSHALL) suggested in a memorandum that the case had become moot.

But the Solicitor General in a later memorandum filed here March 17, 1966, agreed "that the case can no longer be deemed moot" because of Judge Chandler's continuing, expressed disagreement with the order of February 4, 1966.

As noted, the original action against Judge Chandler was taken under 28 U. S. C. § 332. The action taken February 4, 1966, was under 28 U. S. C. § 137, which provides in part:

> "If the district judges in any district are unable to agree upon the adoption of rules or orders for

that purpose the judicial council of the circuit shall make the necessary orders."

But there was no disagreement among the district judges and no power of the Council to act under 28 U. S. C. § 137. That was precisely the strategy that Judge Chandler selected so that if the feud against him continued, it would have to be waged under 28 U. S. C. § 332. But the Council did not oblige. It recited in its order of February 4, 1966: "In the circumstances a disagreement exists as to the division of business and the assignment of cases in the Western District of Oklahoma."

If a disagreement existed on February 4, 1966, it existed after Judge Chandler's so-called "acquiescence" which was expressed in the letter of January 24, 1966. The entire ground is thus swept out from under the mootness argument. In spite of Chandler's "acquiescence" the Council considered the case a live controversy and Chandler has contested the February 4, 1966, order ever since it issued. His opposition and the continuing raging controversy led the former Solicitor General to concede that the case had not become moot. Nor does the Council, even at this late date, make any such suggestion. Nor does the present Solicitor General.

The Court holds that because Judge Chandler refused to express to the Council his disagreement with the February 4, 1966, order, he failed to exhaust a possible means for obtaining the relief he now seeks in this Court. Had he disagreed, however, he would have vested the Council with authority to act under § 137, and that was precisely what he wanted to avoid. As Mr. Justice Harlan points out, the whole basis for Judge Chandler's attack is "that it is illegal for the Council to deprive him of new cases, and equally so for the Council to condition his access to new cases upon his making a request to it that is tantamount to a form of a

certification of disagreement under § 137." The Court states that by not certifying disagreement to the Council Judge Chandler is apparently attempting "to have it both ways." It seems clear, however, that the Court's opinion now allows the Council "to have it both ways"—for unless Judge Chandler certifies disagreement with the February 4, 1966, order, he is barred from relief in this Court; and if he seeks relief from the Council by disagreeing with its order, he concedes jurisdiction in the Council for its actions under § 137. Nothing in *Rescue Army* v. *Municipal Court*, 331 U. S. 549, relied on by the Court, compels this result.

For the reasons fully stated by MR. JUSTICE HARLAN, in Part I of his opinion, the case is ripe for decision and we have no excuse for declining to decide it.

## II

Our first substantial question is whether this is a "case" or "controversy" within our jurisdiction. As Chief Justice Marshall said in *Marbury* v. *Madison*, 1 Cranch 137, 175:

> "To enable this court, then, to issue a *mandamus*, it must be shown to be an exercise of appellate jurisdiction, or to be necessary to enable [the Court] to exercise appellate jurisdiction.
>
> . . . . .
>
> "It is the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a cause already instituted, and does not create that cause."

The question therefore is whether a judicial council is a lower court or inferior tribunal whose decisions are reviewable in the exercise of our appellate jurisdiction. A judicial council is only the court of appeals for a named circuit sitting *en banc*. These councils were created to place "responsibility for judicial administra-

tion where it belongs—with the judiciary." H. R. Rep. No. 702, 76th Cong., 1st Sess., 4. Chief Justice Groner of the Court of Appeals for the District of Columbia, who helped draft the bill that was enacted, explained it as follows to the Senate:[1]

> "To [give the administrative officer any supervision or control over the exercise of purely judicial functions] would be to destroy the very fundamentals of our theory of government. The administrative officer proposed in this bill is purely an administrative officer. . . . It is his duty to observe and see that whatever is wrong in the administration of justice, from whatever sources it may arise, *is brought to the attention of the judicial council that it may be corrected, by the courts themselves.* That is, as I respectfully suggest, as it ought to be." (Italics added.)

The Council by 28 U. S. C. § 137 is under a duty to "make the necessary orders" in case the district judges are "unable to agree upon the adoption of rules or orders for that purpose." The Council directs the district judges to carry out certain measures. That is indeed the role of a judicial entity. Only members of the Court of Appeals are members of the Council. Those sitting on the Council do not even change their hats. Expediting the flow of cases to the dockets of district judges is wholly in line with the judicial function. We stated in *Textile Mills Corp.* v. *Commissioner,* 314 U. S. 326, 332:

> "There are numerous functions of the court, as a 'court of record, with appellate jurisdiction,' other than hearing and deciding appeals. Under the Judicial Code these embrace prescribing the form of

---

[1] Hearings on S. 188 before a Subcommittee of the Senate Committee on the Judiciary, 76th Cong., 1st Sess., 12–13 (Apr. 4–5, 1939).

writs and other process and the form and style of its seal (§ 122); the making of rules and regulations (§ 122); the appointment of a clerk (§ 124) and the approval of the appointment and removal of deputy clerks (§ 125); and the fixing of the 'times' when court shall be held. § 126."

Some functions performed by a Judicial Council may be "administrative." But where, as here, it moves to disqualify a judge from sitting, removing him *pro tanto* from office, it moves against the individual with all of the sting and much of the stigma that impeachment carries. That action gives rise to a "case" or "controversy" triggered by the Council. The Council is therefore under the circumstances an inferior judicial tribunal over which we have appellate jurisdiction where a "case" or "controversy" arises. On that assumption, it is not seriously argued that mandamus is an inappropriate remedy under the All Writs Act.[2]

The order of December 13, 1965, may have been qualified but it has not been erased. Petitioner still is disqualified to sit on incoming cases. He still carries the stigma of the brand put on him by the Council. We should remember that the cessation of illegal conduct does not make a case moot:

> "A controversy may remain to be settled in such circumstances . . . *e. g.*, a dispute over the legality of the challenged practices. . . . The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion." *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 632.

---

[2] "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U. S. C. § 1651 (a).

## III

An independent judiciary is one of this Nation's outstanding characteristics. Once a federal judge is confirmed by the Senate and takes his oath, he is independent of every other judge. He commonly works with other federal judges who are likewise sovereign. But neither one alone nor any number banded together can act as censor and place sanctions on him. Under the Constitution the only leverage that can be asserted against him is impeachment, where pursuant to a resolution passed by the House, he is tried by the Senate, sitting as a jury. Art. I, § 2 and § 3. Our tradition even bars political impeachments as evidenced by the highly partisan, but unsuccessful, effort to oust Justice Samuel Chase of this Court in 1805.[3] The Impeachment Provision of the Constitution[4] indeed provides for the removal of "Officers of the United States," which includes judges, on "Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors." Art. II, § 4.

What the Judicial Council did when it ordered petitioner to "take no action whatsoever in any case or proceeding now or hereafter pending" in his court was to do what only the Court of Impeachment can do. If the business of the federal courts needs administrative oversight, the flow of cases can be regulated. Some judges work more slowly than others; some cases may take months while others take hours or days. Matters of this kind may be regulated by the assignment pro-

---

[3] See Trial of Samuel Chase, vols. 1 and 2 (1805, taken in shorthand by Samuel H. Smith and Thomas Lloyd).

[4] State procedures vary. Thus New York by its constitution provides for the removal of judges by the judiciary court, made up of judges. See *Friedman* v. *State*, 24 N. Y. 2d 528, 249 N. E. 2d 369.

cedure. But there is no power under our Constitution for one group of federal judges to censor or discipline any federal judge and no power to declare him inefficient and strip him of his power to act as a judge.

The mood of some federal judges is opposed to this view and they are active in attempting to make all federal judges walk in some uniform step. What has happened to petitioner is not a rare instance; it has happened to other federal judges who have had perhaps a more libertarian approach to the Bill of Rights than their brethren. The result is that the nonconformist has suffered greatly at the hands of his fellow judges.

The problem is not resolved by saying that only judicial administrative matters are involved. The power to keep a particular judge from sitting on a racial case, a church-and-state case, a free-press case, a search-and-seizure case, a railroad case, an antitrust case, or a union case may have profound consequences. Judges are not fungible; they cover the constitutional spectrum; and a particular judge's emphasis may make a world of difference when it comes to rulings on evidence, the temper of the courtroom, the tolerance for a proffered defense, and the like. Lawyers recognize this when they talk about "shopping" for a judge; Senators recognize this when they are asked to give their "advice and consent" to judicial appointments; laymen recognize this when they appraise the quality and image of the judiciary in their own community.

These are subtle, imponderable factors which other judges should not be allowed to manipulate to further their own concept of the public good. That is the crucial issue at the heart of the present controversy.

All power is a heady thing as evidenced by the increasing efforts of groups of federal judges to act as referees over other federal judges.

138

On June 10, 1969, the Judicial Conference adopted resolutions for the governance of many activities of circuit judges and districts judges. Resolution I provided: [5]

"A judge in regular active service shall not accept compensation of any kind, whether in the form of loans, gifts, gratuities, honoraria or otherwise, for services hereafter performed or to be performed by him except that provided by law for the performance of his judicial duties.

"Provided however, the judicial council of the circuit (or in the case of courts not part of a circuit, the judges of the court in active service) *may upon application of a judge* approve the acceptance of compensation for the performance of services other than his judicial duties *upon a determination that the services are in the public interest or are justified by exceptional circumstances and that the services will not interfere with his judicial duties.* Both the services to be performed and the compensation to be paid shall be made a matter of public record and reported to the Judicial Conference of the United States." (Italics added.)

[5] Resolution I was suspended on November 1, 1969, by the Judicial Conference pending further study, the only residue presently in force being a requirement that a judge who in any quarterly period "receives compensation for non-judicial services in a total amount exceeding $100" shall report the same to a "receiving officer" named by the Chief Justice and acting for the federal judges. In March 1970, the Judicial Conference approved procedures and forms for judges to report outside income pursuant to the Conference Resolution of November 1, 1969. The approved form requires listing of outside income received by the judge, gifts received by the judge or his immediate family in excess of $100, any knowing participation in cases in which the judge or a member of his immediate family had a financial interest in any of the named parties, and all "fiduciary positions" held by the judge, "such as trustee or executor."

In the Ninth Circuit, of which I am Circuit Justice, this resolution was assumed to bar a federal judge from even being an executor of his own mother's estate, unless of course he got a permit from the other judges. Resolution I apparently required permits for federal judges to teach in a law school—a practice which has paid enormous professional dividends and implicates nothing but the interest and energy of the judge. Justice Joseph Story (who sat here from 1811 to 1845) would, I imagine, have been appalled if he had been told that he could not write any of his many books[6] without getting permission from a group of other federal judges. And I imagine that Justice Cardozo, Judge Jerome Frank, and Judge Learned Hand would have felt the same.[7]

To obtain a permit the other judges must determine if the services are "in the public interest." Pray, how could they determine that unless they saw the lecture, or the lecture notes, or the manuscript? And whose "public interest" would control? Judges who have not been educated to the needs of ecology and of conservation?

---

[6] Commentaries on Equity Jurisprudence (2 vols., 1836); Commentaries on Equity Pleadings (1838); Commentaries on the Conflict of Laws (1834); Commentaries on the Constitution of the United States (3 vols., 1833); Commentaries on the Law of Agency (1839); Commentaries on the Law of Bailments (1832); Commentaries on the Law of Bills of Exchange (1843); Commentaries on the Law of Partnership (1841); Commentaries on the Law of Promissory Notes (1845); A Familiar Exposition of the Constitution of the United States (1840); A Selection of Pleadings in Civil Actions (1805).

[7] Justice Cardozo: The Growth of the Law (1931); Law and Literature and Other Essays and Addresses (1931); The Nature of the Judicial Process (1921).

Judge Learned Hand: The Bill of Rights (1958).

Judge Jerome Frank: Courts on Trial—Myth and Reality in American Justice (1949); Not Guilty (1957); If Men Were Angels (1942); Fate and Freedom (1945).

Judges who still have a "plantation" state of mind and relegate many minorities to second-class citizenship? Judges who have a narrow view of freedom of expression or a broad view of due process? Public issues deal with a vast contrariety of views; and judges, like other people, are to be found in all parts of the spectrum. How under the Constitution can one judge's lips be sealed because of the predestined view of other judges? An easy reply is that Resolution I covered only services for "compensation." But books entail royalties; and tax-wise it is not always easy to disassociate an author from royalties. Even though they go ultimately to charity, they pass through his income tax returns.

It is time that an end be put to these efforts of federal judges to ride herd on other federal judges. This is a form of "hazing" having no place under the Constitution. Federal judges are entitled, like other people, to the full freedom of the First Amendment. If they break a law, they can be prosecuted. If they become corrupt or sit in cases in which they have a personal or family stake, they can be impeached by Congress. But I search the Constitution in vain for any power of surveillance that other federal judges have over those aberrations.[8] Some

---

[8] Cf. S. 1506, 91st Cong., 1st Sess., which would amend 28 U. S. C. c. 17, *first* by creating a Commission on Judicial Disabilities and Tenure, composed of five federal judges in active service; *second* giving it power to "undertake an investigation of the official conduct of any judge of the United States appointed to hold office under article III of the Constitution to determine whether the conduct of such judge is and has been consistent with the good behavior required by that article;" and *third* giving it authority to recommend to the Judicial Conference that he be removed from office under the following standard: "Willful misconduct in office or willful and persistent failure to perform his official duties by a judge of the United States shall constitute conduct inconsistent with the good behavior required by article III of the Constitution and shall be cause for the removal of that judge."

of the idiosyncrasies may be displeasing to those who walk in more measured, conservative steps. But those idiosyncrasies can be of no possible constitutional concern to other federal judges.

It is time we put an end to the monstrous practices that seem about to overtake us, by vacating the orders of the Judicial Council that brand Judge Chandler as unfit to sit in oncoming cases. Only Congress can take action, unless the Constitution is amended to allow judges to censor, police, or impeach their fellow judges.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, dissenting.

Fully concurring in the dissent of my Brother DOUGLAS in this case, I wish to add a few words to emphasize once again [1] the gravity of the unconstitutional wrong the Court is inflicting upon United States District Judge Stephen Chandler, and, more important, on our system of government and the Constitution itself. The preparation and adoption of that great document was a turning point in the history of this country and of the world. Our Constitution gave new hopes and dreams for freedom and equal justice to citizens of this country and signaled to the suffering and oppressed people everywhere that government could be humane. One of the many factors which gave birth to these new dreams and hopes was our constitutional plan for a more independent judicial system than had ever before existed. Judges in our system were to hold their offices during "good Behaviour," their compensation was not to be "diminished during their Continuance in Office," [2] and they were to be removed only after impeachment and trial by the United States Congress. While judges, like other people, can be tried,

---

[1] See *Chandler* v. *Judicial Council*, 382 U. S. 1003, 1004 (1966) (dissenting opinion).

[2] Art. III, § 1.

142

convicted, and punished for crimes, no word, phrase, clause, sentence, or even the Constitution taken as a whole, gives any indication that any judge was ever to be partly disqualified or wholly removed from office except by the admittedly difficult method of impeachment by the House of Representatives and conviction by two-thirds of the Senate. Such was the written guarantee in our Constitution of the independence of the judiciary, and such has always been the proud boast of our people.

I am regrettably compelled in this case to say that the Court today, in my judgment, breaks faith with this grand constitutional principle. Judge Chandler, duly appointed, duly confirmed, and never impeached by the Congress, has been barred from doing his work by other judges. The real facts of this case cannot be obscured, nor the effect of the Judicial Council's decisions defended, by any technical, legalistic effort to show that one or the other of the Council's orders issued over the years is "valid." This case must be viewed for what it is—a long history of harassment of Judge Chandler by other judges who somehow feel he is "unfit" to hold office. Their efforts have been going on for at least five years and still Judge Chandler finds no relief. What is involved here is simply a blatant effort on the part of the Council through concerted action to make Judge Chandler a "second-class judge," depriving him of the full power of his office and the right to share equally with all other federal judges in the privileges and responsibilities of the Federal Judiciary. I am unable to find in our Constitution or in any statute any authority whatever for judges to arrogate to themselves and to exercise such powers. Judge Chandler, like every other federal judge including the Justices of this Court, is subject to removal from office only by the constitutionally prescribed mode of impeachment.

The wise authors of our Constitution provided for judicial independence because they were familiar with history; they knew that judges of the past—good, patriotic judges—had occasionally lost not only their offices but had also sometimes lost their freedom and their heads because of the actions and decrees of other judges. They were determined that no such things should happen here. But it appears that the language they used and the protections they thought they had created are not sufficient to protect our judges from the contrived intricacies used by the judges of the Tenth Circuit and this Court to uphold what has happened to Judge Chandler in this case.

I fear that unless the actions taken by the Judicial Council in this case are in some way repudiated, the hope for an independent judiciary will prove to have been no more than an evanescent dream.