**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LOUIS JOE TRUESDALE,
Petitioner-Appellant,

v.

MICHAEL B. MOORE, Commissioner,

South Carolina Department of
Corrections; CHARLES M. CONDON,
Attorney General, State of South
Carolina,
Respondents-Appellees.

No. 97-24

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Dennis W. Shedd, District Judge.
(CA-96-2792-4-19BE)

Argued: March 2, 1998

Decided: April 29, 1998

Before WILKINSON, Chief Judge, and WILLIAMS and
MICHAEL, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Williams and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Mark Oliver Denehy, ADLER, POLLOCK & SHEE-
HAN, INCORPORATED, Providence, Rhode Island; John Henry

Blume, III, Columbia, South Carolina, for Appellant. Donald John Zelenka, Assistant Deputy Attorney General, Columbia, South Carolina, for Appellees. **ON BRIEF:** Joseph Avanzato, ADLER, POLLOCK & SHEEHAN, INCORPORATED, Providence, Rhode Island; Keir M. Weyble, Columbia, South Carolina, for Appellant. Charles M. Condon, Attorney General, John W. McIntosh, Deputy Attorney General, Columbia, South Carolina, for Appellees.

_____

**OPINION**

WILKINSON, Chief Judge:

Louis Joe Truesdale was sentenced to death for the murder of Rebecca Eudy. After exhausting state challenges to the third death sentence imposed by the state courts, he petitioned the United States District Court for the District of South Carolina for a writ of habeas corpus under 28 U.S.C. § 2254. The district court denied the petition, and we now affirm the judgment.

I.

On Saturday, April 5, 1980, Rebecca Eudy's car was found, abandoned, with a pool of blood on the passenger's seat and floor. Sandra Marshall, the friend with whom Eudy had spent the evening of Friday, April 4, told police that she had seen a man in an army field jacket lurking around the parking lot where she and Eudy parted for the evening. She also told the police that Eudy drove erratically out of the parking lot -- Eudy did not turn on her lights, and she went to the wrong exit. Marshall pulled over to wait for her friend. As Eudy passed, Eudy remained expressionless and did not wave or smile as she ordinarily did. The police learned from another witness, Roy Curry, that a man in an army jacket had been lurking around another parking lot earlier that evening before driving off in a car registered to Truesdale. The police picked Truesdale up on the afternoon of April 5, informed him of his rights, and took him to the police station for questioning.

Truesdale was again advised of his rights at the station. He said he understood them and proceeded to answer questions. He claimed that

2

he had been fishing Friday afternoon and playing pool with friends until 1:00 Saturday morning. The police began investigating his story. Although not satisfied with his alibi, they told Truesdale he was free to leave around midnight on April 5. Truesdale chose to stay with the police and accompanied them to track down the people with whom he said he had played pool. Truesdale fell asleep in the car, and when he awoke he told the police he "hadn't killed any girl." According to the police, at this time they were not yet certain Eudy had been murdered, and no one had suggested to Truesdale that anyone had been killed. Their suspicions were further aroused when one of the people with whom Truesdale claimed to have played pool could not satisfactorily corroborate Truesdale's story.

Around 2:30 a.m. on Sunday, April 6, the police and Truesdale returned to the Sheriff's Department. Truesdale said he wanted to go home. The police told him he was free to leave. Nevertheless, Truesdale continued to speak with the police, eventually telling them to go to his mother's house, where they would find a bloody pair of jeans and an army field jacket. After the police retrieved the bloody clothes and Truesdale again waived his Miranda rights, Truesdale confessed that he had kidnapped Eudy and had sexual intercourse with her. He insisted that he had himself been kidnapped and forced to commit these acts at gunpoint by an unidentified third person, who shot and killed Eudy. He then took the police to the field where Eudy's body was located. At this point Truesdale was arrested for kidnapping, criminal sexual conduct in the first degree, and murder. On April 8, 1980, Truesdale signed a statement prepared for him by the police reiterating his confession to kidnapping and forcible sexual intercourse with Eudy and implicating the unidentified third person in Eudy's murder.

Truesdale was tried for kidnapping, criminal sexual conduct, and murder in December 1980. Truesdale initially pled not guilty, but after the jury was selected he changed his plea to guilty. The jury recommended a sentence of death on the murder charge. The sentence was vacated on direct appeal and a new trial ordered. State v. Truesdale, 296 S.E.2d 528 (S.C. 1982). At this second trial, which took place in 1983, Truesdale again pled not guilty to all charges. The State supplemented its evidence from the 1980 trial with ballistics evidence linking the bullets that killed Eudy to a gun found outside

3

Truesdale's mother's house. Truesdale's counsel presented no evidence in his defense. The jury found Truesdale guilty of murder, criminal sexual conduct in the first degree, and kidnapping. At the sentencing phase, the State introduced two photos of Eudy's lifeless body as evidence of aggravation. Truesdale unsuccessfully sought to introduce evidence that showed his ability to adapt to prison life. After deliberating for fifteen minutes, the jury recommended that Truesdale be sentenced to death.[1]

The South Carolina Supreme Court affirmed the convictions and sentence. State v. Truesdale, 328 S.E.2d 53 (S.C. 1984). And Truesdale's petition for a writ of certiorari to the United States Supreme Court was unsuccessful. Truesdale v. South Carolina, 471 U.S. 1009 (1985). After the South Carolina courts denied his application for postconviction relief (PCR), Truesdale v. Aiken , 347 S.E.2d 101 (S.C. 1986), however, the United States Supreme Court granted Truesdale's petition for a writ of certiorari and vacated his death sentence on grounds that Skipper v. South Carolina, 476 U.S. 1 (1986), entitled him to introduce evidence of his adaptability to prison life. Truesdale v. Aiken, 480 U.S. 527 (1987).

Truesdale's resentencing took place in 1987. The State again presented evidence adduced during the guilt phase of the 1983 trial, supplemented with forensic evidence to establish that Eudy had been raped and that Truesdale could have been the rapist. The State again introduced a photograph of Eudy's body as evidence of aggravation. Truesdale countered with testimony from family and friends, teachers, employers, coworkers, and prison officials. After twelve hours of deliberation, the jury again recommended a death sentence. The South Carolina Supreme Court affirmed the death sentence. State v. Truesdale, 393 S.E.2d 168 (S.C. 1990). And Truesdale's certiorari petition to the United States Supreme Court was denied. Truesdale v. South Carolina, 498 U.S. 1074 (1991).

_____

[1] Truesdale was also sentenced to thirty years imprisonment for criminal sexual conduct. Pursuant to South Carolina law, no sentence was imposed for kidnapping. Throughout the course of this litigation, Truesdale's appeals have focused only on his death sentence, and we do so as well.

4

On state postconviction review in 1993, Truesdale introduced several pieces of new evidence about the circumstances of the crimes of which he stood convicted. In addition, Truesdale raised numerous legal claims, many of which were dismissed as successive because not raised at the 1985 PCR proceeding or barred because not raised on direct appeal. The remaining claims, including the contention that his 1987 resentencing counsel was ineffective, were denied on the merits. His petition for a writ of certiorari to the South Carolina Supreme Court was denied. And the United States Supreme Court denied Truesdale's petition for a writ of certiorari. Truesdale v. Moore, 117 S. Ct. 527 (1996).

Truesdale's federal habeas petition was filed on September 13, 1996. The district court referred the matter to a magistrate judge. After denying Truesdale's request for an evidentiary hearing, the magistrate judge granted the State's motion for summary judgment. The district court accepted the magistrate judge's report and recommendation in full and dismissed Truesdale's petition. Truesdale now appeals.

II.

Truesdale claims he received constitutionally ineffective assistance of counsel at his 1987 resentencing proceeding. He charges counsel with a variety of errors, which can be grouped into two general categories: (1) the failure to present evidence either in mitigation or that would rebut the State's case on the aggravating factors of kidnapping and sexual assault; and (2) the failure to raise the claim that African Americans were underrepresented in the jury pool in violation of the Sixth and Fourteenth Amendments. Neither of these claims provides a basis for habeas relief.[2]

_____

[2] Truesdale also challenges the district court's ruling that amendments to the federal habeas corpus scheme enacted by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA), apply to his case. We need not take up this question, because the bulk of Truesdale's claims are procedurally defaulted, and, as elaborated below, those that remain do not warrant habeas relief under any standard of review. We reject Truesdale's novel suggestion that AEDPA somehow abolished procedural default in all cases not governed by Chapter 154. See Moleterno v. Nelson, 114 F.3d 629, 633-34 (7th Cir. 1997) (rejecting similar claim).

5

A.

At his 1993 state PCR proceeding Truesdale identified the rebuttal and mitigating evidence he claims counsel should have raised in 1987. He presented the testimony of numerous witnesses, including family, friends, acquaintances, attorneys, and experts. These witnesses testified to, among other things, his claimed prior romantic relationship with Eudy, the alleged inconclusiveness of the forensic evidence that he raped Eudy or that he and she had any sexual relations at all, the fact that bloody fingerprints on Eudy's car did not match Truesdale's, and the claim that Truesdale suffered from organic brain dysfunction. Truesdale contends it was unreasonable for his resentencing counsel not to uncover and present this evidence to the jury to counter the State's case in aggravation. For example, Truesdale states that evidence of romantic involvement between Eudy and himself suggests that Eudy went with him willingly (instead of being kidnapped) and that any sexual relations between him and Eudy were consensual (instead of rape). And he claims that evidence of the mysterious bloody fingerprints would have corroborated his story that an armed third person forced him to attack Eudy.

At this late stage, our review of counsel's performance is quite deferential. The Supreme Court has instructed us to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Strickland v. Washington</u>, 466 U.S. 668, 689 (1984). Thus we ask not whether, with the benefit of hindsight, we would have conducted the defense differently. In the wake of a conviction and death sentence such a conclusion "is all too tempting." <u>Id.</u> Rather we must place ourselves in the shoes of Truesdale's attorneys and ask only whether their choices were objectively unreasonable. We cannot say that counsel's efforts in this case failed to satisfy <u>Strickland</u>'s standard.

As did the district court, we conclude that Truesdale's resentencing counsel pursued a reasonable strategy of attempting to downplay the brutal crimes committed against Eudy and to portray Truesdale as a normal person with a single aberrant episode of violence. As counsel explained:

> [W]e felt that he had already been convicted [of kidnapping and rape] and we wanted to try and stay away from all

6

that evidence. We wanted to stay away from any rehashing of the same kinds of things that would hurt our case. We wanted to then try to mitigate, I think, as much as we could. We were looking more towards the mitigation, of calling the witnesses from C.C.I., which were a development that prior two trial lawyers didn't have available to them.

And I remember distinctly calling the young son, which, again, by this time had grown in age and was a strategy to try to engender as much sympathy as we can for Louis, also showing that he could be rehabilitated, that he would be incarcerated but rehabilitated and perhaps save his life.

. . . .

In this case we had a fresh jury that had not heard the guilt phase. I was in hopes, I think at this point in time, seven years had passed from the first trial. I was in hopes that the solicitor perhaps would not be as sharp on his presentation, that he wouldn't get the kinds of things in that perhaps cross examination might remind him of.

I think that was our strategy, was try to minimize the guilt aspect of it and try to maximize the mitigation.

This reasonable strategy dictated both what counsel did -- present abundant character evidence in hopes of giving the jury a favorable impression of Truesdale as a normal, happy person-- and what counsel did not do -- relitigate the gruesome details of Truesdale's crimes or suggest that Truesdale suffered from mental illness at the time.

This strategy of painting a sympathetic character portrait rather than rehashing the details of defendant's past convictions meets Strickland's standards. Counsel reasonably chose not to introduce any rebuttal evidence about the kidnapping and rape. Truesdale had already confessed to kidnapping and sexually assaulting Eudy, and his responsibility for her murder had been conclusively established by his conviction. Thus counsel reasonably concluded that disputing precisely how Eudy was abducted, assaulted, and killed could serve no

7

constructive purpose and might in fact do more harm than good. For example, dwelling on whether Eudy was dead or alive when she was sexually assaulted, as Truesdale now claims counsel should have done, would not have been likely to build sympathy for Truesdale. In fact, such an approach might well squander the advantage of having a fresh jury deciding Truesdale's sentence, see Evans v. Thompson, 881 F.2d 117, 121 (4th Cir. 1989), by prolonging the jury's exposure to the grisly facts of Eudy's rape and murder. While Truesdale complains that counsel was unaware of some of this rebuttal evidence, it was not unreasonable for counsel to limit his investigation. In Strickland the Court recognized that counsel might "make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. In focusing almost exclusively on mitigation rather than rebuttal, Truesdale's counsel made just such a reasonable tactical decision.

Nor was there anything unreasonable about counsel's selection of what mitigating evidence to present. Truesdale says counsel should have informed the jury that his history of substance abuse had resulted in organic brain dysfunction. This condition caused Truesdale to have "difficulty with cognitive tasks, judgment, things of that sort that would require quick rational thinking" and made him less able to adapt his behavior to societal norms. We have recognized that "[t]rial counsel is too frequently placed in a no-win situation with respect to possible mitigating evidence at the sentencing phase of a capital case." Bunch v. Thompson, 949 F.2d 1354, 1364 (4th Cir. 1991). Failure to present particular mitigating evidence often leads to claims that counsel should have introduced such evidence or investigated further. On the other hand, the introduction of evidence that the jury does not credit or that the state turns to its advantage leads to ineffectiveness claims also. Thus "[t]he best course for a federal habeas court is to credit plausible strategic judgments." Id. Truesdale's counsel deliberately steered away from developing any mental health evidence, calculating that it would not help portray Truesdale as normal and capable of rehabilitation. Mental health evidence like that of Truesdale's organic brain dysfunction is a double-edged sword that might as easily have condemned Truesdale to death as excused his actions. The decision not to pursue this line of inquiry exemplifies the type of reasonable "strategic judgment" that we respect. Id.

8

B.

Truesdale also asserts that it was constitutionally ineffective assistance for his resentencing counsel not to object that South Carolina's procedure for selecting jury venires, drawing them at random from voter registration lists, violated the Sixth and Fourteenth Amendments. He alleges that this error tainted the jury that sentenced him to death in 1980, the jury that convicted him and again sentenced him to death in 1983, and the jury that finally sentenced him to death in 1987. Truesdale cannot now raise the claims relating to the 1980 and 1983 trials, as he did not raise them at the 1985 state PCR hearing.**3** S.C. Code Ann. § 17-27-90; Arnold v. State , 420 S.E.2d 834 (S.C. 1992); Aice v. State, 409 S.E.2d 392 (S.C. 1991). Truesdale's claims regarding the 1987 venire are properly presented, but without merit. It was not constitutionally ineffective assistance for Truesdale's resentencing counsel not to pursue futile claims.

To make out a prima facie case for a violation of the Sixth Amendment right to a jury venire that is a "fair cross-section" of the community, Truesdale must establish that (1) a "distinctive" segment of the community (2) is "substantially underrepresented" in the jury pool (3) as a result of "systematic exclusion" of the group. Duren v. Missouri, 439 U.S. 357, 364 (1979). Truesdale has not advanced any direct evidence of "systematic exclusion" of African Americans from the venire. Instead he seeks to rely on the bare assertion of substantial underrepresentation to prove that there was a structural or systemic impediment to voter registration by African Americans. We have consistently required more to make out a violation of the "fair cross-section" guarantee. The use of voter registration lists "has been consistently upheld against both statutory and constitutional challenges, unless the voter list in question had been compiled in a discriminatory manner." United States v. Cecil, 836 F.2d 1431, 1445 (4th Cir. 1988) (en banc) (emphasis added); see also United States v. Lewis, 10 F.3d

_____

**3** The state PCR court ruled that these claims were defaulted. Truesdale has not demonstrated cause and prejudice or a miscarriage of justice to excuse the default. See, e.g., Mackall v. Angelone, 131 F.3d 442, 445-46 (4th Cir. 1997), cert. denied, 118 S. Ct. 907 (1998); Matthews v. Evatt, 105 F.3d 907, 916 (4th Cir.), cert. denied sub nom. Matthews v. Moore, 118 S. Ct. 102 (1997).

1086 (4th Cir. 1993) (approving use of non-discriminatory voter registration lists in jury selection). "The Supreme Court has never gone so far as to hold that the constitution requires venires to be, statistically, a substantially true mirror of the community." Cecil, 836 F.2d at 1445-46 (quoting Barber v. Ponte, 772 F.2d 982, 997 (1st Cir. 1985) (en banc)). To allow Truesdale to substitute evidence of substantial underrepresentation for evidence of systematic exclusion would go a long way towards requiring perfect statistical correspondence between racial percentages in the venire and those in the community. Such a rule would exalt racial proportionality over neutral jury selection procedure.

Truesdale also argues that the composition of the jury pool violated the equal protection guarantees of the Fourteenth Amendment as applied in Castaneda v. Partida, 430 U.S. 482 (1977). He acknowledges that to prevail on this claim he must show some evidence that the selection procedure "is susceptible of abuse or is not racially neutral." Id. at 494. Truesdale advances no claim that South Carolina's system of selecting veniremen was manipulable or was otherwise racially biased. On the contrary, the only evidence in the record about how South Carolina's jury system worked suggests that it was safe from racially-motivated abuse -- veniremen were drawn at random from a locked jury box containing identical numbered capsules; numbers were assigned alphabetically to names on the unaltered voter registration list; and the Jury Commissioners responsible for jury selection exercised no discretion in selecting from the jury box and did not consider the race or qualifications of potential jurors. Thus Truesdale has not carried his burden of proving discriminatory purpose. See Duren, 439 U.S. at 368 n.26 (describing "discriminatory purpose" as an "essential element of the constitutional violation" recognized in Castaneda); Folston v. Allsbrook, 691 F.2d 184, 186 (4th Cir. 1982) (fact that jury system was impartial dispelled any inference of discrimination arising from statistical disparity). Truesdale asks us to infer discriminatory intent from the appearance of discriminatory impact, but, as with his Sixth Amendment claim, this would go well beyond where this court or the Supreme Court has gone before. We thus reaffirm that allegations of statistical disparity will not suffice to show a violation of the Fourteenth Amendment where no discriminatory purpose was afoot.

10

Finding no merit in Truesdale's challenges to the 1987 jury pool, we cannot say that it was constitutionally ineffective assistance for his counsel not to raise these claims at resentencing. It is certainly reasonable for counsel not to raise unmeritorious claims. And because these claims would have been dismissed had they been raised, Truesdale cannot show a reasonable probability of any different outcome at resentencing. Cf. Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (finding no prejudice from failure to raise a claim based on a precedent that was later overruled).

III.

In his petition for a writ of habeas corpus Truesdale also specified thirteen grounds for challenging the fairness of his 1983 trial and the effectiveness of his 1983 counsel. We agree with the district court that most of Truesdale's fair trial claims are procedurally defaulted because they were not raised on direct appeal of his conviction and sentence. Kornahrens v. Evatt, 66 F.3d 1350, 1361-64 (4th Cir. 1995), cert. denied sub nom., Kornahrens v. Moore , 116 S. Ct. 1575 (1996). And because he did not raise his ineffective assistance claim at the 1985 PCR proceeding, it too is barred. Mackall v. Angelone, 131 F.3d 442 (4th Cir. 1998) (en banc), cert. denied, 118 S. Ct. 907 (1998). We address the three remaining fair trial claims in turn.[4]

First, Truesdale contends that admission of evidence about his assertion of the right to remain silent denied him a fair trial. At trial, a police officer related to the jury that while Truesdale was in custody, and before Eudy's death was generally known, Truesdale declared to the police that he "hadn't killed any girl." The offending statement came thereafter, when the officer told the jury that Truesdale did not respond when he was asked what girl he was talking about. We shall assume arguendo that this remark constitutes a viola-

_____

[4] Truesdale also challenges the district court's denial of an evidentiary hearing on these claims. Truesdale was not entitled to a hearing on procedurally defaulted claims. And, as will become apparent from the discussion below, the remaining claims focus on matters that are sufficiently presented in the record of voir dire and trial. Thus we are hard pressed to imagine what additional evidence Truesdale would have offered on these issues had a hearing been held.

tion of <u>Doyle v. Ohio</u>, 426 U.S. 610, 619 (1976), which recognized that introduction of evidence that the defendant invoked his right to remain silent largely vitiates that right. Nevertheless, any alleged <u>Doyle</u> error was harmless. <u>See Brecht v. Abrahamson</u>, 507 U.S. 619 (1993). At no other point in the trial was Truesdale's silence made known to the jury -- neither the police nor the prosecutor referred to it again. <u>See Greer v. Miller</u>, 483 U.S. 756, 764 (1987) ("It is significant that in each of the cases in which this Court has applied <u>Doyle</u>, the trial court has permitted specific inquiry or argument respecting the defendant's post-<u>Miranda</u> silence."). And the jury heard ample additional evidence of guilt, including Truesdale's partial confession. Thus, any error in the officer's testimony cannot be said to have "had substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 623.

Next, Truesdale challenges the trial court's instruction on reasonable doubt.[5] We have disfavored any attempt on the part of federal trial courts to define reasonable doubt, although we have been reluctant to reverse where the instruction as a whole in no way diluted the government's burden of proof. <u>See United States v. Reives</u>, 15 F.3d 42, 45 (4th Cir. 1994). This same inquiry about whether the government benefitted from a diluted burden of proof must inform our collateral review of this sentence. Truesdale charges that by equating reasonable doubt with "a real doubt" and "a substantial doubt" the instruction led the jury to believe that it could convict him based upon a lower standard of proof. While in the proper case, substituting "substantial doubt" for "reasonable doubt" might violate due process, the mere use of the words "substantial doubt" does not do so. <u>See, e.g.</u>,

_____

[5] The instruction read as follows:

> The state, however, is not required to prove the guilt of a defendant beyond all doubt or beyond every doubt, but beyond a reasonable doubt. The term reasonable doubt as used in these instructions is defined as a substantial doubt or a well-founded doubt arising out of the evidence or the lack of evidence. A reasonable doubt is not a weak doubt or a slight doubt, nor is a reasonable doubt a whimsical, fanciful or imaginary doubt, for a person may of course have these kinds of doubts about any proposition. A reasonable doubt then is a real doubt for which a person honestly seeking the truth can give a reason.

Victor v. Nebraska, 511 U.S. 1, 19-20 (1994). In fact, we rejected a due process challenge to very similar instructions before, finding that "the full instruction tempered any risk of confusion from the substantial doubt language." Kornahrens, 66 F.3d at 1363; see also Adams v. Aiken, 41 F.3d 175, 179-80 (4th Cir. 1994). As in Victor and Adams, the instruction used at Truesdale's trial contrasted "substantial doubt" with "weak doubt," "slight doubt," and "whimsical, fanciful or imaginary doubt." This contrast clarifies that the term "substantial doubt" was used in the sense that Victor allowed, to mean doubt that is "not seeming or imaginary," rather than in the sense Victor condemned, which is doubt "specified to a large degree." See Victor, 511 U.S. at 19-20; Adams, 41 F.3d at 181. Because the jury was clearly instructed that they need not feel doubt "to a large degree" in order to acquit and that any doubt that was not fanciful or imaginary would suffice for acquittal, the instruction did not lessen the government's burden.

Third, Truesdale challenges the exclusion of two potential jurors, Johnnie McCluney and Willie Powell, on the basis of their alleged unwillingness to impose the death penalty. We hold the trial court's exclusion of these veniremen to be wholly consistent with the standard set forth in Witherspoon v. Illinois, 391 U.S. 510 (1968), and Lockhart v. McCree, 476 U.S. 162 (1986). We generally review the determinations of the trial judge, who had the benefit of first-hand exposure to the voir dire, with deference. This deference means that where a venireman's responses reveal some ambiguity about his willingness or ability to impose the death penalty, we presume the correctness of the trial court's decision. Maynard v. Dixon, 943 F.2d 407, 415 (4th Cir. 1991). Taken as a whole, the statements of McCluney and Powell at the very least evidence ambiguity, and several statements by each manifest a flat unwillingness to sentence another to death. For example, McCluney indicated that she did not believe she could impose the death penalty, that she would feel as guilty as the murderer she was sentencing, that God would not be pleased were she to vote for death, and that death was a judgment only God could make. Similarly, Powell stated numerous times that he opposed the death penalty and confirmed that his opposition to it would prevent him voting for a death sentence "under any and all circumstances." We respect the fact that citizens may conscientiously hold this view. At the same time, the trial court was correct to note that these two

13

jurors could not render a verdict according to law and thus properly excluded them from the jury.

IV.

Finally, Truesdale challenges Judicial Council Order No. 113, which governs death penalty representation in the Fourth Circuit. Order No. 113, adopted by this circuit's Judicial Council on October 3, 1996, has two primary purposes. First, it establishes guidelines to ensure qualified representation of all capital defendants in federal courts in this circuit. The order outlines a plan for district courts and the circuit court to identify qualified attorneys who are available to render assistance to capital defendants at federal trials and appeals as well as in federal postconviction proceedings. The order charges the courts to ascertain which attorneys have enough experience and expertise to serve as lead counsel and which are qualified to serve only as second-chair counsel and to compile lists of these attorneys. The courts are to monitor attorneys' developing expertise and update these lists as necessary. The order further recommends that Federal Public Defenders be eligible to represent federal criminal defendants at capital trials, on direct appeal, and in proceedings pursuant to 28 U.S.C. § 2255, but that they not represent state criminal defendants in proceedings pursuant to 28 U.S.C. § 2254. Second, Order No. 113 imposes on district courts and the circuit court a timetable for deciding petitions brought under 28 U.S.C. §§ 2254 and 2255 by defendants who are under sentence of death. District courts are instructed to render a decision and enter final judgment within 180 days of the date on which the petition is filed, subject to an extension of up to thirty days if the court determines that justice so requires. The court of appeals is directed to render a decision within 120 days of the date on which petitioner's reply brief is filed. The court of appeals is also to rule on any petition for rehearing or suggestion for rehearing en banc within thirty days of the date the petition or suggestion is filed or the date a response thereto is filed, whichever is later. And if rehearing is granted, any hearing must be conducted and a final decision rendered within 120 days of the entry of the order granting rehearing. If a case is not timely decided the Circuit Executive may seek an explanation of the reasons why the court has not complied with the time limitations. One reasonable explanation, for example,

14

would be that a court needed to hold a case for a critical decision of the Supreme Court or the Fourth Circuit.

Truesdale challenges only the second aspect of the order. He claims that the timetable established in Order No. 113 for the disposition of habeas petitions brought by death-sentenced defendants is invalid as inconsistent with AEDPA and because it was promulgated without the public notice and opportunity for comment outlined in 28 U.S.C. § 332(d)(1).

A.

Quite independently of AEDPA, Congress has vested Judicial Councils with general governmental authority over the circuits. The Judicial Council of each circuit is instructed to "make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit." 28 U.S.C. § 332(d)(1). This charge to the Councils employs broad and emphatic language, and it speaks directly to the expeditious resolution of judicial business. While this section has not been extensively litigated, it has been interpreted to vest Judicial Councils with broad "management power" -- that is, the authority "to enforce reasonable standards as to when and where court shall be held, how long a case may be delayed in decision, whether a given case is to be tried, and many other routine matters." Chandler, United States District Judge v. Judicial Council of the Tenth Circuit, 398 U.S. 74, 84, 85 (1970). Further, "the power entrusted to the Councils by § 332 . . . necessarily involves a large amount of discretion; accordingly, review of the Councils' actions will usually be narrow in scope." Id. at 108 (Harlan, J., concurring). Chandler specifically mentions the authority of Councils to decide "how long a case may be delayed in decision," id. at 84, and it seems certain "that abatement of delays in disposition of cases was a principal purpose for creation of the Councils." Id. at 123 (Harlan, J., concurring). Indeed, Congress' intent in enacting section 332, "as manifested by both the language and history of the act, was to give the Councils broad powers to deal with the evil of judicial delay." Hilbert v. Dooling, 476 F.2d 355, 360 (2d Cir. 1973) (en banc).

Truesdale makes much of AEDPA's so-called quid pro quo, charging that Order No. 113 disrupts the statute's incentive structure. He

15

claims that the order gives states in the Fourth Circuit the benefits of opting into Chapter 154 of AEDPA -- shortened deadlines for capital habeas petitions -- without requiring these states to meet Chapter 154's requirements for opting in -- guaranteed resources and representation for state habeas petitioners. But this objection to Order No. 113 misses the mark for several reasons.

First, Truesdale overlooks one important difference between AEDPA and the Judicial Council's order: their different enforcement provisions. AEDPA gives <u>states</u> power to "enforce a time limitation" imposed on a district court "by petitioning for a writ of mandamus to the court of appeals," 28 U.S.C. § 2266(b)(4)(B), and to enforce the time limits against courts of appeals "by applying for a writ of mandamus to the Supreme Court," 28 U.S.C. § 2266(c)(4)(B). By contrast, Order No. 113 provides simply that the <u>Circuit Executive</u> can monitor compliance with the timetable by inquiring into the reasons for delay. Contrary to Truesdale's assertion, the order does not decide whether any state within the Fourth Circuit satisfies the requirements of Chapter 154, and it does not remove the incentive for states to acquire the right to bring a mandamus action by meeting Chapter 154 requirements.

Nor can we identify any inconsistency between the aims of AEDPA and Order No. 113. Like Order No. 113, AEDPA itself was designed to streamline federal collateral review of capital sentences. The statute expedites this process both by imposing time constraints in some capital cases, <u>see</u> 28 U.S.C. § 2266, and by making federal review of final state court decisions less searching, <u>see</u> 28 U.S.C. § 2254. In enacting AEDPA, Congress also sought to ensure the fairness of collateral review of death sentences. Likewise, the Council's order does not overlook considerations of fairness but instead outlines steps to guarantee competent representation in capital cases in the federal courts.

Ultimately, Truesdale's claim that the Judicial Council's exercise of its governance authority somehow conflicts with AEDPA is unavailing. Congress was fully aware of the authority that Judicial Councils exercise over the expeditious conduct of litigation in their respective circuits. Yet AEDPA did not speak at all to the powers or role of Judicial Councils, much less abridge or curtail them, raising

16

the strong presumption that the statute left unchanged the Councils' responsibility under section 332. In this way, AEDPA left the Councils with the authority, and indeed the obligation, to make particularized findings and responsive orders as necessary to address conditions of delay within their respective jurisdictions.

In adopting Order No. 113, this circuit's Judicial Council simply exercised its recognized power to address this problem. Before Order No. 113, the Fourth Circuit faced a problem of delay in collateral review of capital convictions and sentences. In the report accompanying Order No. 113 the Judicial Council itself referred to the case of Correll v. Thompson, 63 F.3d 1279 (4th Cir. 1995), where a § 2254 petition languished in the district court for three years. This case was no aberration, and in fact delays of three to ten years were not unusual. See, e.g., Roberts v. Moore, 1998 WL 77841 (4th Cir. Feb. 4, 1998) (unpublished) (§ 2254 petition pending in district court since 1987 prior to appeal); Gilbert v. Moore, 134 F.3d 642 (4th Cir. 1998) (en banc) (§ 2254 petition pending in district court since 1984 prior to appeal); Howard v. Moore, 131 F.3d 399 (4th Cir. 1997) (en banc) (§ 2254 petition pending in district court since 1993 prior to appeal). Unquestionably, such pervasive "delay in criminal cases is an impediment to the `expeditious administration of justice' within this circuit," Government of the Virgin Islands v. Bryan, 818 F.2d 1069, 1074 (3d Cir. 1987) (quoting 28 U.S.C. § 332(d)). More than that, however, such inordinate delays threaten respect for the rule of law.

The Council thus acted pursuant to its statutory authority in responding to a recurrent problem of delay in collateral review of capital cases. Its response, Order No. 113, falls within the core of the Judicial Council's § 332 power and took the precise form Congress envisioned when it vested Judicial Councils with administrative responsibility for the conduct of judicial business within the circuits. It cannot be said that a Judicial Council has misused its authority when it fulfills the very purpose for which Congress has established it.

B.

Next Truesdale claims the Judicial Council violated the command of 28 U.S.C. § 332(d)(1) that "[a]ny general order relating to practice

17

and procedure shall be made or amended only after giving appropriate public notice and an opportunity for comment." Order No. 113, however, does not "relat[e] to practice and procedure," as that phrase is commonly understood.

The relevant statute, 28 U.S.C. § 332, gives considerable discretion to courts and circuit Judicial Councils to choose how to regulate court business, whether by formal rules, standing orders, or other means. And the only guidance the statute provides on what form these rules should take, or the manner in which they should be promulgated, is that "[a]ny general order relating to practice and procedure" requires notice and comment. 28 U.S.C. § 332(d)(1). In drafting and considering Order No. 113, the Judicial Council addressed a simple, internal problem: the delay within the Fourth Circuit in cases involving collateral review of capital sentences. The Council selected an internal solution to that problem and determined that no public notice and comment period were necessary. Order No. 113 imposes requirements on judges and courts within the Fourth Circuit. The order is not addressed to litigants or litigators, the usual focus of procedural rules. Nothing in the order alters any briefing or other deadlines placed on counsel. Nothing creates a right in any party to enforce the court's internal deadlines. Thus Order No. 113 is not a rule of practice or procedure for which notice and comment are required. Moreover, after Order No. 113 was adopted, the Circuit Executive, in an abundance of caution, sought an opinion from the General Counsel of the Administrative Office of the United States Courts. Counsel's opinion simply confirmed the Council's determination: because "[t]he order and its accompanying report are internal in their focus," the requirement of notice and comment "is not implicated by this order." Letter from William R. Burchill, Jr., Associate Director and General Counsel, Administrative Office of the United States Courts, to Samuel W. Phillips, Circuit Executive, United States Court of Appeals for the Fourth Circuit 2 (Dec. 27, 1996).

C.

Finally, Truesdale has failed to identify how Order No. 113 has caused him prejudice. A petitioner claiming that he is illegally detained should desire his claims to be decided expeditiously. Moreover, this case has suffered from no shortage of due process. The

18

issues that lie at the heart of Truesdale's petition have been extensively canvassed in eighteen years of litigation in state and federal court. Rebecca Eudy was murdered in 1980, and this litigation has been ongoing since then, including two trials, three sentencing hearings, numerous state appeals, four petitions for certiorari to the United States Supreme Court (one of which resulted in resentencing), multiple state PCR proceedings, and now a petition for federal habeas relief. Regardless of Order No. 113, this opinion would issue in a timely fashion simply because of the obligation every court should feel to render judgment promptly and conscientiously. We are satisfied that the jury's verdict and sentence have substantial evidentiary support and that they were imposed in accordance with constitutional requirements. Having heard oral argument from able counsel and having reviewed Truesdale's claims with care, we affirm the judgment of the district court dismissing the petition.

AFFIRMED

19